**STARK & STARK**
*A Professional Corporation*
Princeton Pike Corporate Center
993 Lenox Drive, Building 2
P.O. Box 5315
Princeton, NJ  08543-5315
(609) 896-9060
Attorneys for Plaintiffs
By: Domenic B. Sanginiti, Jr., Esq. (01879-2007)

| | |
|---|---|
| P.O.<br><br>Plaintiff<br><br>vs.<br><br>JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND FICTITIOUS DEFENDANTS 1-13:<br>(fictitious designations)<br><br>Defendants | Docket #:<br><br>**CIVIL ACTION**<br><br>COMPLAINT AND JURY DEMAND |

Plaintiff, P.O., by and through his undersigned counsel, brings this Complaint against Defendants JUUL Labs, Inc., PAX Labs, Inc., Altria Group, Inc., and Philip Morris USA, Inc., alleges as follows:

## I.    <u>INTRODUCTION</u>

1.        P.O. is a victim of Defendants' orchestrated efforts to addict a new generation of teenagers to nicotine. Although he is only 20 years old, P.O. has already developed a severe nicotine addiction through use of the JUUL, an electronic nicotine delivery system (ENDS) or e-cigarette. This extreme addiction, particularly in his vulnerable, developing brain, has resulted in a permanent brain injury. Defendant's wrongful conduct in marketing, promoting, manufacturing, designing, and selling JUUL substantially contributed to P.O.'s life-altering injuries.

2.          In 2015, JUUL set out to recapture the magic of the most successful product ever made—the cigarette. Due to regulations and court orders preventing the major cigarette manufacturers from marketing to young people, youth smoking had decreased to its lowest levels in decades. While the public health community celebrated this decline as a victory, JUUL saw an opportunity. Seizing on regulatory inaction and loopholes for e-cigarettes, JUUL set out to develop and market a highly addictive product that could be packaged and sold to young people. Youth is and has always been the most sought-after market for cigarette companies, because they are the most vulnerable to nicotine addiction and are most likely to become customers for life.

3.          JUUL was designed perfectly for teenagers. It doesn't look or smell like a cigarette. It is a sleek, high-tech youth-friendly battery-powered device that looks like a USB drive. The JUUL device heats a nicotine-filled liquid JUUL pod, sold separately in fun flavors like mango and cool mint, delivering powerfully potent doses of nicotine, along with aerosol and other toxic chemicals into the lungs, body and brain. Unlike noxious cigarette smoke, when a JUUL user exhales, the smoke is undetectable. JUUL is small, easily concealable and can be used practically anywhere without parents or teachers knowing; just Google "JUUL in school" and find more than 23,000 videos on how to JUUL anywhere without detection. This is part of the appeal, fostered and bolstered by JUUL's viral marketing campaigns using young models to make the products look cool and stylish.

4.          Defendant designed JUUL to quickly and severely addict young people to nicotine, one of the most addictive chemicals in the world. By studying cigarette industry archives, JUUL learned how to manipulate the nicotine in its products to maximize addictiveness, particularly among new users and young people, and thereby increase sales. JUUL designed its products to have maximum inhalability, without any "throat hit" or irritation that would serve as a natural deterrent to new users. The sole purpose of this design element was to initiate new smokers, since those who already smoke cigarettes are tolerant to the throat hit sensation and associate it with smoking and nicotine satisfaction. At the same time, JUUL designed its device to deliver substantially higher concentrations of nicotine per puff than

traditional cigarettes and most other e-cigarettes. This combination of ease of inhalation and high nicotine delivery makes JUUL both powerfully addictive and dangerous.

5.      Nicotine is particularly dangerous to young people whose brains are still developing through the mid-20s. Nicotine is not only addictive developing adolescent brains, but it also induce seizures and it permanently alters the structure of the brain and causes permanent mood changes and other cognitive disorders.

6.      Several studies, including one recently released by the American Stroke Association, have shown that e-cigarettes increase the risk of stroke, heart attack and coronary artery disease.[1] Other studies have shown that e-cigarettes containing nicotine significantly increase blood pressure, heart rate and arterial stiffness, and also cause vascular damage, which can lead to strokes and other cardiovascular injuries. These studies build on the well-established research that nicotine increases blood pressure.

7.      The United States Surgeon General has concluded that e-cigarettes, including JUUL, are not safe for anyone under age 26.[2]

8.      Even though e-cigarettes are unsafe for anyone under 26, JUUL heavily promoted its products to young people. Following the wildly successful playbook laid out in historic cigarette industry documents, Defendants leveraged social media and utilized other marketing and promotion tactics, long outlawed for cigarette companies, to capture the highly-lucrative youth market. JUUL preyed on youth using medium and themes that exploit teenagers' vulnerabilities to create and sustain nicotine addiction, all for financial gain, and without giving kids any warnings about the serious risks of addiction, stroke, and other permanent injuries.

9.      At the time P.O. used JUUL, none of JUUL's advertising, marketing, promotion, packaging or website disclosed any of the health effects and risks that JUUL knew or

---

[1] *E-cigarettes linked to higher risk of stroke, heart attack, diseased* arteries (Jan. 30, 2019) American Stroke Association *News Release*, Abstract 9, Session A2, *https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries* (as of July 5, 2019).
[2] U.S Surgeon General and the U.S. Centers for Disease Control and Prevention, Office on Smoking and Health, *Know The Risks: E-cigarettes and Young People* (2019) *https://e-cigarettes.surgeongeneral.gov/* (as of July 5th, 2019).

should have known would occur from use of its products. These risks include severe nicotine addiction, significant increases in blood pressure, vascular damage, increased risk of stroke, heart attacks and other cardiovascular injuries, permanent brain changes, mood disorders, heightened risk of cancer, and other harms. JUUL never disclosed that it its products were unsafe for anyone under age 26. Instead, the imaging, advertising, promotion, packaging and overall marketing represented the product as safe, fun, and not harmful. As one of the JUUL founders has said: "We don't think a lot about addiction here because we're not trying to design a cessation product at all...anything about health is not on our mind".[3] JUUL's design, manufacturing, marketing and distribution of this product has proven this statement to be true.

10.    Since 2015 when JUUL hit the market, JUUL has become pervasive in schools across the country and adolescent use is rampant. JUUL not only dominates the multi-billion dollar e-cigarette market, it has expanded the size of that market significantly—mostly via young non-smokers. The tobacco company Defendant Altria (formerly known as Philip Morris, also a Defendant) acquired a 35% stake in JUUL for $12.8 billion, giving Defendant Altria access to the new generation of customers JUUL has groomed.

11.    JUUL has created an epidemic. According to Alex Azar, the Secretary of the U.S. Department of Health and Human Services, "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."[4] JUUL's conduct has led to a surge in teen e-cigarette use, creating the "largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance use outcome in the U.S."[5] In a mere two years, Defendant undid more than a decade of progress in reducing teen smoking, thereby increasing

---

[3] Tiku, *Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette: Surprise, it's a rectangle,* The Verge (April 21, 2015) *www.theverge.com/ 2015/4/21/8458629/pax-labs-e-cigarette-juul* (as of July 5, 2019).

[4] *Surgeon General releases advisory on E-cigarette epidemic among youth*, U.S. Department of Health & Human Services (Dec 18, 2018) *www.hhs.gov/about/news/2018/12/18/surgeon-general-releases-advisory-e-cigarette-epidemic-among-youth.html* (as of July 5, 2019).

[5] Boyles, *Surgeon General Calls for New E-Cig Restrictions: 'I am officially declaring e-cigarette use among youth an epidemic* (Dec 28, 2018) *www.medpagetoday.com/ primarycare/smoking/77000* (as of July 5, 2019).

nicotine use among teenagers to levels not seen since the early 2000s. Plaintiff was both a target and a victim of JUUL's conduct.

12.     As a result of Defendant's conduct, Plaintiff has suffered life-altering personal injuries and seeks all appropriate remedies and relief.

## II.    JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over the Defendants, because Plaintiff lives in New Jersey. Defendants have purposely availed themselves of the benefits, protections and privileges of the laws of the District of New Jersey through the promotion, marketing distribution and sale of the products at issue and have purposely directed its activities in this State.

14.     Venue is proper in the District of New Jersey because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this county and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## III.    THE PLAINTIFF

15.     Plaintiff, P.O., a resident of the State of New Jersey, who is now 20 years old, first tried a JUUL when it was offered to him from friends at his high school where it was rampant. P.O. thereafter began using and purchasing JUUL vaping products when he was 17 which he would obtain from local convenience store near hi high school that specifically marketed JUUL products. When he first began "JUULing", P.O. was not aware of the dangers associated with the use of nicotine or the extent and severity of addiction it would cause.

16.     Prior to using a JUUL, none of the advertisements or in-store promotions Plaintiff saw, nor would have seen, disclosed the nature or addiction risks of JUUL's products, nor that JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette. Nor did they indicate that the JUUL was an age-restricted product and not safe for anyone under the age of 26.

17.     P.O. was attracted to and most often used the Mango flavor. P.O. quickly became severely addicted to nicotine from his use of JUUL, reaching the point of vaping up to

two JUULpods per day. Once Mango was not available, P.O. switched to "cool" mint. P.O. now struggles to function without nicotine. He experiences strong mood swings, anxiety and bouts of depression from withdrawal from the JUUL.    In addition, P.O.'s JUUL-induced nicotine addiction led him to smoke traditional cigarettes at 18 years old.

18.    P.O. still struggles with this nicotine addiction and will continue to struggle with this addiction for the rest of his life. P.O.'s nicotine addiction from JUUL permanently injured and altered his developing brain. In addition to his severe nicotine addiction and brain injury, P.O. has suffered harm through exposure to significant toxic substances, which may cause or contribute to causing disease and future health problems.

19.    Defendants' conduct has harmed P.O. physically, emotionally, and financially.

## IV.    THE DEFENDANTS

### A. Defendants

20.    Defendant JUUL Labs, Inc. ("JUUL") is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes. JUUL ratified each and every act or omission alleged herein in proximately causing the injuries and damages alleged herein.

21.    Defendant PAX Labs, Inc. ("PAX"), is a Delaware Corporation, having its principal place of business in San Francisco, California. JUUL Labs, Inc. was originally a part of PAX, but was spun out as a separate company in 2017. A substantial portion of the conduct cited here occurred while JUUL was part of PAX.

22.    Defendant Altria Group, Inc. ("Altria"), is incorporated in Virginia and has its principal place of business in Richmond, Virginia. Altria has partnered with JUUL Labs, Inc.

23.    Defendant Philip Morris USA, Inc. (Philip Morris), is a wholly-owned subsidiary of Altria. Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia. Philip Morris is engaged in the manufacture and sale of e-

cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

24.     Altria and Philip Morris are referred to collectively as the Altria Defendants. In 2018, Altria acquired 35% ownership in JUUL for $12.8 billion and access to Altria's industry infrastructure.

25.     Defendants each marketed and sold their products in specialized retailers of tobacco products and are well aware of the dangers associated with tobacco products, including the addictive nature of nicotine. In recent years, specialized retailers of tobacco products, as well as local convenience stores, have become retailers for electronic cigarettes, particularly JUUL products. These store do not simply put JUUL products on their shelves to sell to of-age customers. Rather, they actively and knowingly sold high nicotine containing JUUL products to underage customers with no warning of its dangerous propensities.

**B. Fictitious Defendants 1-13**

26.     Fictitious Defendant 1 is, whether singular or plural, being those persons, firms, partnerships, corporations or other entities, whose acts caused or contributed to cause the damages suffered by the Plaintiff herein and whose names are unknown to the Plaintiff at this time but which will be substituted by amendment when ascertained.

27.     Fictitious Defendant 2 is, whether singular or plural, that entity who or which designed JUUL products involved in the occurrence made the basis of Plaintiff's Complaint, any component part thereof, or any attendant product use or available for use therewith.

28.     Fictitious Defendant 3 is, whether singular or plural, that entity who or which manufactured or assembled JUUL products and anything involved in the occurrence made the basis of Plaintiff's Complaint, any component part thereof, or any attendant product used or available for use therewith.

29.     Fictitious Defendant 4 is, whether singular or plural, that entity who or which had any role in the distributive chain regarding JUUL products involved in the occurrence made

the basis of Plaintiff's Complaint, any component thereof, or any attendant accessory or product used or available for use therewith.

30.    Fictitious Defendant 5 is, whether singular or plural, that entity or those entities, that individual or those individuals, other than those described above, whose negligence, intentional conduct, willfulness, wantonness, or other wrongful conduct contributed to cause the occurrence made the basis of Plaintiff's Complaint.

31.    Fictitious Defendant 6 is whether singular or plural, that entity or those entities, other than those described above, which is the successor-in-interest of any of those entities described above.

32.    Fictitious Defendant 7 is, whether singular or plural, that entity who or which was responsible for the safety/health engineering of JUUL devices and/or products made the basis of Plaintiff's Complaint.

33.    Fictitious Defendant 8 is, whether singular or plural, that entity who or which was the buyer, seller, or as a buyer's or seller's agent or representative had any role in the distribution of the JUUL device and/or products involved in the occurrence made the basis of Plaintiff's Complaint.

34.    Fictitious Defendant 9 is, whether singular or plural, that entity who or which issued or failed to issue warnings or instructions regarding the use of the JUUL device and/or products involved in the occurrence made the basis of Plaintiff's Complaint.

35.    Fictitious Defendant 10 is, whether singular or plural, that entity who or which manufactured the component parts of the JUUL device and/or products involved in the occurrence made the basis of Plaintiff's Complaint.

36.    Fictitious Defendant 11 is, whether singular or plural, that entity who or which was a buyer, seller, or buyer's agent, had any role in the distribution of any JUUL product involved in the occurrence made the basis of Plaintiff's Complaint.

37.        Fictitious Defendant 12 is, whether singular or plural, that entity who or which issued warnings or instructions regarding the use or inhalation of any JUUL product involved in the occurrence made the basis of Plaintiff's Complaint.

38.        Fictitious Defendant 13 is, whether singular or plural, that person, firm, corporation, or entity who or which has conducted safety inspections or analyses with respect to assembling JUUL devices and/or products involved in the occurrence made the basis of Plaintiff's Complaint, (Plaintiff avers that Defendants herein are otherwise unknown to Plaintiff at this time, or if their names are known to Plaintiff their identities as proper party. Defendants are not known to the Plaintiff at this time, and their true names will be substituted by amendment when ascertained).

## V.    FACTUAL ALLEGATIONS

### A.    JUUL Sought to Re-create the "Magic" of the Cigarette, the "Most Successful Consumer Product of All Time", using the Cigarette Industry's Playbook.

39.        JUUL's founder James Monsees has described the cigarette as "the most successful consumer product of all time . . . . an amazing product."[6] Because of "some problems" inherent in the cigarette, JUUL's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[7]

40.        Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[8] With a focus on recreating the "ritual and elegance that smoking once exemplified,"[9] Monsees and Adam Bowen

---

[6] Chaykowski, *Billionaires-to-be: Cigarette breakers - James Monsees and Adam Bowen have cornered the US e-cigarette market with Juul. Up next: The world*, FORBES Magazine (Sep 27, 2018), *www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1* (as of July 5, 2019).

[7] Mings, *Ploom model Two Slays Smoking with Slick Design and Heated Tobacco Pods*, Solid Smack (Apr 23, 2014), *www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods/* (as of July 5, 2019).

[8] *Id.*

[9] *James Monsees – Co-founder and CEO of Ploom*, IDEAMENSCH (Apr 11, 2014), *https://ideamensch.com/james-monsees/* (as of July 5, 2019).

set out to "meet the needs of people who want to enjoy tobacco but don't self-identify with — or don't necessarily want to be associated with — cigarettes."[10]

41.    JUUL used the cigarette industry's prior practices as a playbook.  Monsees has publicly admitted that JUUL built its e-cigarette business by first consulting cigarette industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the cigarette industry, governmental officials, and injured smokers. "[Industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[11]

42.    JUUL researched how cigarette companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry." Among the documents JUUL would have found were those documenting how to manipulate nicotine pH to maximize the delivery of nicotine in a youth-friendly vapor that delivers minimal "throat hit"—a combination that creates unprecedented risks of nicotine abuse and addiction, as detailed further below.[12]

43.    JUUL also engaged former cigarette industry researchers to consult on the design of their product.  JUUL's founder James Monsees noted in Wired magazine that "people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore.  If you go to Altria's R&D facility, it's empty."  The Wired article stated that "some of those people are now on Pax's team of advisers, helping develop Juul."[13]

---

[10] *Id.*

[11] Montoya, *Pax Labs: Origins With James Monsees*, Social Underground, *https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/* (as of July 5, 2019).

[12] *Id.*

[13] Pierce, *This Might Just Be The First Great E-Cig*, *WIRED*, (Apr 21, 2015), *www.wired.com/2015/04/pax-juul-ecig/* (as of July 5, 2019).

44.        JUUL also used cigarette industry advertisements—which were created to lure nonsmoking youth—as a blueprint for JUUL's advertising campaigns. In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them."[14]

45.        JUUL achieved its vision. Since its launch in 2015, JUUL has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017. According to a recent Wells-Fargo report, JUUL owns three-quarters of the e-cigarette market.[15]

**B.     JUUL is a Sleek, Easy to Conceal Nicotine Delivery Device with Kid-Friendly Flavors.**

46.        The JUUL e-cigarette looks sleek and high-tech. JUUL looks like a USB flash drive, and it actually charges in a computer's USB drive. It is about the size and shape of a pack of chewing gum; it is small enough to fit in a closed hand. JUUL is easy to conceal from parents and teachers. The odor emitted from JUUL is a reduced aerosol without much scent – unlike the distinct smell of conventional cigarettes.

47.        The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor.

 

---

[14] Jackler *et al.*, *JUUL Advertising Over its First Three Years on the Market, Stanford Research into the Impact of Tobacco Advertising*, Stanford University School of Medicine (Jan 31, 2019), *http://tobacco.stanford.edu/tobacco_main/ publications/JUUL_Marketing_Stanford.pdf* (as of July 5, 2019).

[15] Durbin *et al.*, *Letter from United States Senators to Kevin Burns CEO JUUL Labs Inc. (Apr 8, 2019)*, *www.durbin.senate.gov/imo/media/doc/ FINAL%20JUUL%20Letter%204.8.19.pdf* (as of July 5, 2019).

Each JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

48.    JUUL manufactures and distributes its nicotine formulation as JUULpods, which contain JUUL's nicotine liquid. JUUL exclusively sells its pods in four-packs, in a variety







of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. According to a recent survey of more than 1,000 12 to 17 year-olds, 6.5% admitted to using a JUUL e-cigarette. Of those, 86% of users most recently used fruit medley, mango, cool mint, or crème brulee.[16]

---

[16] Willett, *JUUL: Recognition, use and perceptions* (Apr 26, 2018), *www.publichealthlawcenter.org/sites/default/files/JUUL-Webinar-Slides-Apr262018.pdf* (as of July 5, 2019).

49.     The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, Defendant can finely tune the amount of nicotine vapor the JUUL delivers.[17]

### C.     E-Cigarettes Containing Nicotine are Addictive, Increase the Risk for Strokes, and are Unsafe for Anyone under Age 26.

50.     All leading health authorities support the three major conclusions of a 1988 report by the Surgeon General of the United States regarding nicotine and tobacco:

a.     Cigarettes and other forms of tobacco are addictive;

b.     Nicotine is the drug in tobacco that causes addiction;

c.     The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

51.     Nicotine fosters addiction through the brain's "reward" pathway. A stimulant and a relaxant, nicotine affects the central nervous system; increases in blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin, and causes muscle relaxation. When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs. Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. These effects are caused by the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.[18]

---

[17] Talih *et al.*, Characteristics and toxicant emissions of JUUL electronic cigarette (Feb 11, 2019) Tob Control. 054616 *www.ncbi.nlm.nih.gov/pubmed/30745326/* (as of July 5, 2019).

[18] Neal L. Benowitz, Pharmacology of Nicotine: Addiction, Smoking-Induced Disease, and Therapeutics (Sep 27, 2009) Annu Rev Pharmacol Toxicol 49: 57–71 *www.ncbi.nlm.nih.gov/pmc/articles/PMC2946180/* (as of July 5th, 2019).

52.     The neurological changes caused by nicotine create addiction. Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user.[19]

53.     Once a brain is addicted to nicotine, the absence of nicotine causes compulsive drug-seeking behavior, which, if not satisfied, results in withdrawal symptoms including anxiety, tension, depression, irritability, difficulty in concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations and tremors – and intense cravings for nicotine. Though smokers commonly report pleasure and reduced anger, tension, depression and stress after smoking a cigarette, many of these effects are actually due to the relief of unpleasant withdrawal symptoms that occur when a person stops smoking and deprives the brain and body of nicotine. Studies have found that most smokers do not like smoking most of the time but do so to avoid withdrawal symptoms.[20]

54.     Nicotine causes permanent brain changes.  The effects of nicotine exposure on the brain of youth and young adults include addiction, priming for use of other addictive substances, reduced impulse control, deficits in attention and cognition, and mood disorders.[21]

55.     Nicotine is also associated with cardiovascular, reproductive, and immunosuppressive problems, and is also a carcinogen.[22]  Nicotine adversely affects the heart, eyes, reproductive system, lung, and kidneys. It is well-established that nicotine increases blood

---

[19] *Id.*

[20] Rigotti, Strategies to help a smoker who is struggling to quit (Oct 17, 2012) JAMA 308 (15): 1573–1580, *www.ncbi.nlm.nih.gov/pmc/articles/PMC4562427/* (as of July 5, 2019);  Paolini & De Biasi, Mechanistic insights into nicotine withdrawal (Oct. 15, 2011) Biochem Pharmacol 82(8): 996–1007, *www.ncbi.nlm.nih.gov/pmc/articles/PMC3312005/* (as of July 5, 2019).

[21] Yuan *et al.*, Nicotine and the adolescent brain (May 27, 2015) The Journal of Physiology 593(Pt 16): 3397–3412, *www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/* (as of July 5, 2019); U.S Surgeon General and the U.S. Centers for Disease Control and Prevention, Office on Smoking and Health, *Know The Risks: E-cigarettes and Young People* (2019) *https://e-cigarettes.surgeongeneral.gov/* (as of July 5th, 2019).

[22] Mishra *et al.*, Harmful Effects of Nicotine (2015) Indian J. Med. Paediatr. Oncol., 36(1): 24–31 (Jan- Mar 2015), *www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/* (as of July 5, 2019). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/.

pressure. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Aside from its use as a stimulant, the only other known use of nicotine is as an insecticide.[23]

56.    Several studies have shown that e-cigarettes increase the risk of strokes and heart attacks.[24]

57.    Research has also demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which increases the risk for strokes and heart attacks.[25]

58.    Further, scientists have found that e-cigarettes also cause oxidative stress, which leads to vascular disease and damage, known risk factors for strokes.[26]

---

[23] *Id.*

[24] E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries (Jan 30, 2019) American Stroke Association *News Release,* Abstract 9, Session A2, *https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries* (as of July 5, 2019); Vindhyal *et al.*, Impact on cardiovascular outcomes among e-cigarette users: a review from National Health Interview Surveys (Mar 2019) Journal of the American College of Cardiology, Vol. 73, Iss. 9, Suppl. 2, *www.onlinejacc.org/content/73/9_Supplement_2/11* (as of July 5, 2019); Ndunda & Muutu, Electronic cigarette use is associated with a higher risk of stroke (Jan 30, 2019) International Stroke Conference 2019 Oral Abstracts. Community/risk factors, Vol. 50, Suppl. 1, Abst. 9, *www.ahajournals.org/doi/10.1161/str.50.suppl_1.9* (as of July 5, 2019); Bhatta & Glantz, Electronic Cigarette Use and Myocardial Infarction Among Adults in the US Population Assessment of Tobacco and Health (Jun 18, 2019) Journal of the American Heart Association, Vol. 8, Iss. 12, *www.ahajournals.org/doi/10.1161/JAHA.119.012317* (as of July 5 2019).

[25] Vlachopoulos *et al.*, Electronic cigarette smoking increases aortic stiffness and blood pressure in young smokers (Sep 10, 2017) J. Am. Col.l Cardiol. 67:2802–2803, *www.sciencedaily.com/releases/2017/09/170910232512.htm* (as of July 5, 2019)

[26] Thompson, Vaping May Hurt the Lining of Your Blood Vessels (May 28, 2019) WebMD HealthDay Reporter *www.webmd.com/mental-health/addiction/news/20190528/vaping-may-hurt-the-lining-of-your-blood-vessels#1* (as of July 5th, 2019). JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users. The ingredients in JUULpods include glycerol, propylene glycol, nicotine, benzoic acid, and flavoring chemicals. *www.juul.com/learn/pods* (as of July 5, 2019).

59.     With respect to JUUL in particular, a recent study found that "the concentrations of nicotine and some flavor chemicals (e.g. ethyl maltol) are high enough to be cytotoxic in acute in vitro assays".[27]

60.     Nicotine affects neurological development in adolescents, and exposure to nicotine during adolescence produces an increased vulnerability to nicotine addiction.[28] Adolescent nicotine addiction causes "substantial neural remodeling" including those parts of the brain governed by dopamine or acetylcholine, which play central roles in reward functioning and cognitive function, including executive function mediated by the prefrontal cortex. A "clear-cut relationship" between adolescent smokers and diminished neural responses has been observed such that addicts exhibit diminished sensitivity to non-drug rewards (e.g., financial rewards). This relationship becomes even more severe in adolescents who smoke more than 5 cigarettes a day. In sum, "the use of extremely rewarding drugs, such as nicotine, may decrease the pleasure obtained from non-drug rewards." *Id.* These changes occur in "early phases of smoking." *Id.* Other brain changes from nicotine include increased sensitivity to other drugs and heightened impulsivity.[29] "Brain imaging on adolescents suggest that those who begin smoking regularly at a young age have markedly reduced activity in the prefrontal cortex and perform less well on tasks related to memory and attention compared to people who don't smoke."[30]

61.     Public health authorities have concluded that e-cigarettes are unsafe for anyone under age 26.[31]

---

[27] Omaiye *et al.*, High-Nicotine Electronic Cigarette Products: Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations (Apr 17, 2019) Chem Res Toxicol 17;32(6):1058-1069 *www.ncbi.nlm.nih.gov/pubmed/30896936* (as of July 5, 2019).

[28] Arain *et al.*, Maturation Of The Adolescent Brain (Apr 25, 2013), Neuropsychiatric Disease and Treatment, 9:449–461 *http://doi.org/10.2147/NDT.S39776* (as of July 5, 2019).

[29] University of Warwick, "Different brain areas linked to smoking and drinking" (Jan 8, 2019) ScienceDaily, *www.sciencedaily.com/releases/2019/01/190108095119.htm* (as of July 5, 2019).

[30] Brodwin, *An e-cigarette with twice the nicotine of comparable devices is taking over high schools - and scientists are sounding the alarm* (Apr 30, 2018) Business Insider, *www.businessinsider.com/juul-e-cig-vaping-health-effects-2018-3* (as of July 5, 2019).

[31] U.S Surgeon General and the U.S. Centers for Disease Control and Prevention, Office on Smoking and Health, *Know The Risks: E-cigarettes and Young People* (2019) *https://e-*

**D.      JUUL Designed its E-Cigarettes to Make them Easy for Young People to Inhale and to Deliver Substantially Higher Doses of Nicotine than Cigarettes.**

62.      According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[32] The cigarette industry has long known that "nicotine is the addicting agent in cigarettes"[33] and that "nicotine satisfaction is the dominant desire" of nicotine addicts.[34]

63.      For this reason, cigarette companies spent decades manipulating nicotine in order to foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," manipulating the pH of nicotine was expected to give cigarettes an "additional nicotine 'kick'."[35] This kick was attributed to increased nicotine absorption associated with lower pH.[36]

64.      JUUL knowingly used the RJR research and conclusions to produce a similar nicotine kick, and thereby promoting increased use and sales of JUUL e-cigarettes. In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier.

---

*cigarettes.surgeongeneral.gov/* (as of July 5th, 2019).

[32] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General, Chapter 4, Nicotine Addiction: Past and Present (2010), *www.ncbi.nlm.nih.gov/books/NBK53017/* (as of July 5th, 2019).

[33] Brown & Williamson official A.J. Mellman, (1983) Tobacco Industry Quotes on Nicotine Addiction, *www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes %20on%20Nicotine%20Addiction.pdf* (as of July 5, 2019).

[34] *Id.*, R.J. Reynolds Tobacco Co. marketing memo, 1972.

[35] *Id.*, 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market."

[36] Benowitz *et al.*, Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology (Oct. 13, 2010), Handb Exp Pharmacol 192:29–60, *www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/* (as of July 5, 2019).

65.      In a 2015 interview, Ari Atkins, a JUUL research & development engineer and one of the inventors of the JUUL device said this about the role of acids: "In the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it …" He pauses. "I've got to choose the words carefully here: Appropriate for inhalation."[37]

66.      JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form. This reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not be absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat. A recent study found that JUUL's e-liquid had a pH of under 6.0, suggesting that the JUUL contains almost no freebase (i.e., non-salt form) nicotine.[38]

67.      The vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine—and hence causes the same amount of irritation—as a nearly nicotine-free 3 mg/mL e-liquid.[39]

68.      The same chart further shows that the Duell Study authors found that the low freebase fraction in its aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." *Id.* At 431-434.

69.      The authors noted that "tobacco company documents suggest that products [like JUUL] with high nicotine levels but a low [percentage of freebase nicotine] will yield vape

---

[37] Pierce, *This Might Just Be The First Great E-Cig* (Apr 21, 2015) WIRED, *www.wired.com/2015/04/pax-juul-ecig/* (as of July 5, 2019).

[38] Lauterbach, One More Time Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There? (2018) *www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf* (as of July 5, 2019); Other studies have confirmed the low ratio of freebase nicotine in JUUL products. *See* Duell *et al.*, Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy (Jun 18, 2018) 31 Chem. Res. Toxicol. 431-434, *www.ncbi.nlm.nih.gov/pmc/articles/PMC6008736/* (as of July 5th, 2019).

[39] *Id.*, Duell Study, Fig. 3.

aerosols of much reduced harshness as compared to products with even only moderate nicotine levels" but high percentages of freebase nicotine. *Id.*

70.     JUUL's creation of a product with low levels of harshness and minimal throat "hit" is consistent with the goal of producing a product for young non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation. The design also shows that JUUL's intention was to recruit nonsmokers, not existing smoker, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix. Minimizing the throat "hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers, but is crucial to luring a new generation of users.

71.     The Duell study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[40]

72.     JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he is inhaling something harmful. Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation. Reducing or removing this feedback impairs the user's ability to ascertain that he is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction, and repeatedly exposing the user to the health risks associated with the product, such as significantly increased blood pressure.

73.     JUUL sells products that contain relatively low amounts of throat-irritating freebase nicotine, yet contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems ("ENDS") containing freebase nicotine.

---

[40] *Id.*, Duell Study (citing Willett, *et al.*, Recognition, use and perceptions of JUUL among youth and young adults, Tobacco, Tob Control. 2019 Jan;28(1):115-116.)

74.        Blood plasma studies in the '895 patent[41] show that vaping nicotine benzoate increases nicotine delivery compared to cigarettes or vaporized solutions of freebase nicotine. In fact, nicotine uptake was up to four times higher for nicotine salt formulations than traditional cigarettes (approximately 4 ng/mL/min compared to approximately 1 ng/mL/min). JUUL's data also indicates that nicotine salt solutions produce a higher heart rate in a shorter amount of time (a 50 beats/minute increase within 2 minutes for nicotine salt, versus a 40 beats/minute increase in 2.5 minutes for a Pall Mall cigarette). Nicotine salts also cause a faster and more significant rise in heart rate than placebo or vaporized freebase nicotine.

75.        JUUL's '895 patent shows that a 4% solution of benzoic acid nicotine salt causes a peak nicotine-blood concentration ("Cmax") of approximately 15 ng/mL, compared to a Cmax of 11 ng/mL for a Pall Mall cigarette.[42]

76.        As high as the reported nicotine dose reported for JUUL pods is, the actual dose is likely higher. Though the strongest benzoic acid concentration mentioned in the '895 patent is 4% (i.e., 40 mg/mL of benzoic acid), one study tested four flavors of JUUL pods and found a 4.5% benzoic acid ($44.8 \pm 0.6$) solution.[43] That study found that JUUL pods contained a concentration of 6.2% nicotine salt (about 60 mg/mL), rather than the 5% nicotine (about 50 mg/mL) advertised. JUUL pods containing an absolute nicotine concentration 1.2% higher than the stated 5% on the label (a relative increase of over 20%) coupled with more benzoic acid than listed in the '895 patent produce higher nicotine absorption than expected for the advertised formulation.

77.        Other studies have reported even higher actual concentrations of nicotine in JUUL pods. Some experts estimate that JUUL pods contain the same nicotine as two packs of cigarettes.[44]

---

[41] *See* U.S. Patent No. 9, 215, 895.

[42] '895 Patent, at col. 26, ll. 33-50.

[43] Pankow *et al.*, Benzene formation in electronic cigarettes (Mar 8, 2017) PLoS One. 2017; 12(3): e0173055 *www.ncbi.nlm.nih.gov/pmc/articles/PMC5342216/* (as of July 5, 2019).

[44] *6 important facts about JUUL*, Truth Initiative, *https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul* (as of July 5, 2019)

78.    JUUL is delivering doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[45] With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a JUUL pod will easily exceed the nicotine dose of a traditional cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and Israel is seeking to do the same. [46] As Israel's Deputy Health Minister has noted, "a product that contains a concentration of nicotine that is almost three times the level permitted in the European Union constitutes a danger to public health and justifies immediate and authoritative steps to prevent it from entering the Israeli market."[47]

79.    Comparison of available data regarding per puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes."[48] The Reilly study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per puff. By comparison, a 2014

---

[45] "E-Cigarettes"
*https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf* (as of July 5, 2019) (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

[46] Belluz, *Juul, the Vape Device Teens are Getting Hooked On, Explained* (Dec 20, 2018) Vox *https://www.vox.com/science-and-health/2018/5/1/17286638/juul-vaping-e-cigarette* (as of July 5, 2019).

[47] Linder-Ganz, *JUUL Warns It Will Fight Israel Over Its Potential Ban on E-Cigarettes* (Jan 30, 2018), HAARETZ, *www.haaretz.com/israel-news/business/juul-warns-it-will-fight-israel-over-potential-ban-on-its-e-cigarettes-1.6140058* (as of July 5, 2019).

[48] Reilly *et al.*, Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes (Oct 20, 2018) Nicotine Tob Res. 3 (the "Reilly study") *https://www.ncbi.nlm.nih.gov/pubmed/30346584* (as of July 5, 2019).

study using larger 100 mL puffs found that a Marlboro cigarette delivered 152—193 µg/puff.[49] Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 µg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

80.     Because "nicotine yield is strongly correlated with tobacco consumption,"[50] a JUULpod with more nicotine will strongly correlate with higher rates of consumption of JUULpods, generating more revenue for JUUL.  For example, a historic cigarette industry study looking at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[51] In other words, the more nicotine in the cigarettes, the more cigarettes a person smoked.

81.     Despite the above data, Defendant has failed to disclose to consumers that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

82.     By delivering such potent doses of nicotine, JUUL products magnify the health risks posed by nicotine, significantly increase blood pressure, and place users at heightened risk for stroke, heart attacks and other cardiovascular events.

83.     Further, because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes. Thus, JUULpods are foreseeably exceptionally addictive when used by persons without prior exposure to nicotine—a fact not disclosed by Defendant.

---

[49] Schroeder & Hoffman, Electronic Cigarettes and Nicotine Clinical Pharmacology (May 2014) Tobacco Control 2014: 23:ii30-ii35, *www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/* (as of July 5, 2019).

[50] Jarvis *et al.*, Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey (Jan 2001), JNCI Vol. 93, Issue 2, 134–138 *https://academic.oup.com/jnci/article/93/2/134/2906355* (as of July 6, 2019)

[51] UCSF Library, 1003285443-5443 (US 85421).

84.     At the same time, as discussed above, the throat "hit" from nicotine salts is much lower than that for combustible tobacco products, making it easier to inhale. According to researchers, the "high total nicotine level (addictive delivery)" of a JUUL coupled with its easily inhalable nicotine vapor is "likely to be particularly problematic for public health."[52]

85.     This powerful combination—highly addictive and easy to inhale—also repeatedly exposes users to the toxic chemicals in the vapor, compounding the health risks to users, as described above.

86.     In addition to its nicotine content, the "Cool" Mint pods pose additional risks. The FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had drug-like effects, including "cooling and anesthetic effects that reduce the harshness of cigarette smoke."[53] Mint could also "facilitate deeper and more prolonged inhalation," resulting in "greater smoke intake per cigarette." *Id.* at 500-501.

87.     JUUL has fraudulently concealed material information about the addictive and dangerous nature of its e-cigarettes. Defendant necessarily is in possession of all of this information.

### E.     JUUL's Design Offers No Benefit for Young People, Only Risk.

88.     JUUL's design offers no benefit to young people like P.O., who was not addicted to cigarettes before he started using JUUL.

89.     JUUL's design does however permit concealment which permits young people to hide and conceal from their parents, educators, and adults who would otherwise instruct a young person to avoid use of the JUUL.

---

[52] Duell Study, 431
[53] Proctor, Golden Holocaust: Origins of the Cigarette Catastrophe and the Case for Abolition, 500 (1st ed. 2011).

**F.      JUUL Conspired with Others in the Cigarette Industry to Engage Third-Party Spokespersons to Downplay the Risks of E-cigarettes, Create Doubt, and Misrepresent the Benefits of Nicotine.**

90.      Because JUUL understood that it could not specifically make health-related claims without drawing the ire of the FDA, JUUL conspired with others, including unnamed Fictitious Defendants 1-13, in the cigarette industry to engage consultants, academics, reporters, and other friendly sources such as the American Enterprise Institute, to serve as spokespersons and cheerleaders for e-cigarette products.  Taking yet another page from the cigarette-industry playbook, these influencers masked their connection to the e-cigarette industry, while serving as its mouthpiece to cast doubt about risks and overstate benefits.

91.      For example, just as JUUL launched, cigarette company expert witness Sally Satel published an article in Forbes Magazine touting the benefits of nicotine—claiming it aids in concentration—and stating that it is harmless.[54]  In another article, she lauded efforts by JUUL and others to develop nicotine-related products, and cast any doubters as hysterical and creating a "panic".[55]

92.      Numerous other articles, videos, and podcasts—also spread through social media—echoed this same message that the public health community was overreacting to e-cigarettes and in a panic about nothing.

93.      During each of its multiple fundraising rounds, JUUL assured potential investors that "addiction to something that is not harmful", suggesting that JUUL was no more harmful than coffee.

94.      On information and belief, JUUL and its co-conspirators spread this message through hired third-party spokespersons and influencers.

---

[54] Satel, *Nicotine Itself Isn't The Real Villain* (Jun 19, 2015), Forbes, *www.forbes.com/sites/sallysatel/2015/06/19/nicotine-can-save-lives/#60379f766f43* (as of July 5, 2019).

[55] Satel, *Why The Panic Over JUUL And Teen Vaping May Have Deadly Results* (Apr 11, 2018), Forbes, *www.forbes.com/sites/sallysatel/2018/04/11/why-the-panic-over-juul-and-teen-vaping-may-have-deadly-results/#6b1ec693ea48* (as of July 5, 2019).

95.      Furthering their campaign of doubt and confusion, when asked directly about health risks, JUUL's employees and founders would point reporters to other sources to indicate that its products had been shown to be safe, or not harmful, rather than admit what it knew were the dangers.

96.      JUUL well-understood from the cigarette industry playbook that sowing doubt and confusion over the benefits and risks of e-cigarettes is key to long-term success. First, by creating a "two-sides-to-every-story" narrative, JUUL reduced the barriers for young people and new users to try the product, and gave addicted users permission to keep using the product and avoid the pain of withdrawal. Second, by engaging people who looked like independent experts, JUUL staved off regulation and suppressed political opposition, allowing it a long runway to capture market share. Third, by belittling the public health community, JUUL neutered its most vocal threat.

97.      On information and belief, JUUL conspired with others in the cigarette industry to fraudulently conceal the risks of e-cigarettes, recognizing that a campaign of doubt, misinformation and confusion would benefit all of them and would be the key to the industry's survival.

**G.      JUUL Intentionally Misrepresents and Grossly Understates the Amount of Nicotine in each JUULpod.**

98.      From JUUL's pre-release announcements to this day, JUUL, along with unnamed Fictitious Defendants 1-13 that provided marketing services to JUUL, has continuously falsely represented that each pod contains only as much nicotine as a pack of cigarettes. JUUL repeats these claims widely in advertisements, press releases, on its packaging, and on its web site. For example, some JUUL advertisements and JUUL's website currently provides that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." This statement is false and seriously misleading because, as JUUL knows, it is not just the amount of

nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and other health risks.

99. Defendant knows that benzoic acid affects pH and "absorption of nicotine across biological membranes."[56]

100. Assuming a concentration of 59 mg/mL, JUUL's reported nicotine content corresponds to about 40 mg of nicotine per 0.7 mL JUULpod. If, as JUUL claims, this is equivalent to one pack of cigarette (or 20 cigarettes), that implies 2 mg of nicotine per cigarette.

101. JUUL's equivalency claim further assumes 10 puffs per cigarette (i.e., 200 puff per pack), or 0.2 mg (200 µg) of nicotine per puff.

102. Typically, a cigarette that delivers around one milligram of nicotine in smoke retains "about 14-20 milligrams of nicotine in the unsmoked rod," *USA v. Philip Morris*, p. 567, for an overall delivery of 5-7% of the cigarette's actual nicotine content. A study by the Center for Disease Control found that in "commercial cigarette brands, nicotine concentrations ranged from 16.2 to 26.3 mg nicotine/g tobacco (mean 19.2 mg/g; median 19.4 mg/g)."[57] Assuming an average of 19 milligrams of nicotine per cigarette, an average pack of cigarettes contains 380 milligrams of nicotine, or six times as much nicotine as the 62 milligrams reported for each JUULpod. Yet the average pack would be expected to deliver only 5-7% (19-27 mg) of its nicotine content to the user. In line with this expectation, a study of thousands of smokers found smokers intaking between 1.07 to 1.39 milligrams per cigarette (21.4-27.8 mg per pack).[58] This is less than half of the amount of nicotine contained in a JUULpod (i.e., 2 mg per "cigarette" based on JUUL's stated concentration, or 200 µg per puff assuming 100% delivery). Even with the slightly lower efficiency of delivery demonstrated in studies like Reilly (about 82%, for

---

[56] Benowitz *et al.*, Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology (Oct 12, 2010), Handb Exp Pharmacol 192: 29–60 *www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/* (as of July 5, 2019).

[57] Lawler *et al.*, Surveillance of Nicotine and pH in Cigarette and Cigar Filler(Apr 1, 2018), Tob Regul Sci. 3(Suppl 1): 101–116, *www.ncbi.nlm.nih.gov/pmc/articles/PMC5628511/* (as of July 5 2019).

[58] Jarvis *et al.*, Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey (Jan 17, 2001), JNCI, Vol. 93, 2:134–138, *www.ncbi.nlm.nih.gov/pubmed/11208883* (as of July 5 2019).

averages of 164 µg per puff), this amounts to a substantially higher amount of nicotine that a human will absorb from a JUULpod than from smoking a pack of cigarettes.

103.    JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is therefore literally false and likely to mislead, because the amount of nicotine contained in the JUULpod is perhaps six times less than in a pack of cigarettes, but the actual amount of nicotine consumed via JUULpod is as much as twice as high as that via cigarettes. This fact is never mentioned by JUUL nor Fictitious Defendants 1-13.

104.    Further, while a pack of cigarettes contains 20 cigarettes which each have to be separately lit, the JUUL can be inhaled continuously, and often can be used indoors without detection by others, a feature that JUUL promoted heavily in its advertisements, eliminating the need for smoking breaks. Thus, the device design leads users to intake far more nicotine than would occur with cigarettes.

105.    Finally, the JUUL device does not have a manual or automatic "off" switch. On information and belief, neither the JUULpod nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the upper bound of a cigarette. Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL allows non-stop nicotine consumption, which is limited only by the device's battery. As a result, the JUUL is able to facilitate consumption of extraordinarily high levels of nicotine that a cigarette cannot match. This makes it easier for the user to become addicted to nicotine and poses additional health risks.

106.    Contrary to Defendant's representations, the above data indicate that each JUULpod delivers significantly more nicotine than a pack of cigarettes, both per pack and per puff. JUUL's products thus have the foreseeable effect of luring youth, who react positively to a strong nicotine "kick," and exacerbating nicotine addiction and adverse health effects associated with nicotine consumption.

107.    Thus, JUUL is more harmful when compared to cigarettes, in that the extraordinarily high levels of nicotine can cause heightened blood pressure and stroke, and the

repetitive exposure to the toxins and chemical in JUUL can also cause vascular damage and stroke.

**H.     Defendants Never Warned P.O. that JUUL's Products Were Unsafe, Addictive, and Dangerous.**

108.     At no time before P.O. became severely addicted, did JUUL, nor any of the other unnamed Fictitious Defendants involved in the research, development, marketing and distribution of JUUL products provide any warnings about the risks of addiction, stroke, seizures, heart attacks or other brain damage.

109.     At no time before P.O. became severely addicted did JUUL or any other Defendants warn P.O. that JUUL products were unsafe for him and anyone under age 26, nor instruct him on how much JUUL allegedly would be safe to consume with his brain still developing.

110.     Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018, far too late for Plaintiff. Neither did any of the unnamed Fictitious Defendants 1-13 involved in the research, development, marketing of JUUL products and e-cigarettes provide any warnings. The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUULpods away from children and pets, but contained no warnings specifically about the known effects, or possible long-term effects, of nicotine or vaping/inhaling nicotine salts.  Many of JUUL's advertisements, particularly before November 2017, also lacked a nicotine warning.

111.     Furthermore, JUUL misrepresents the nicotine content of JUULpods by representing it as 5% strength. As discussed above, JUULpods contain more than 5% nicotine by volume, and deliver it in a form that is particularly potent.

112.     Instead, JUUL marketed its JUUL products as an "alternative to cigarettes," thereby giving the false impression that they are not harmful like traditional cigarettes and safe to use.

113.     Plaintiff did not and could have known the risks associated with JUUL, because Defendant had exclusive knowledge about its product, including its design, and concealed that information from him.

114.     Instead, as a result of JUUL's wildly successful marketing campaign, based on tactics developed by the cigarette industry and amplified in social media, P.O. reasonably believed that JUUL was safe, harmless, fun, and cool—a thing to do with his friends.

115.     A 2017 study by the Truth Initiative Schroeder Institute® found that 6 percent of youth and 10 percent of young adults have used a JUUL e-cigarette in the last 30 days. The study also found that while many young people are aware of JUUL, many are unaware that the product always contains the addictive chemical nicotine.

a.     Twenty-five percent of survey respondents aged 15 to 24 recognized a JUUL e-cigarette device when shown a photo of the product.

b.     Among those who recognized JUUL, 25 percent reported that use of this product is called "JUULing," indicating that this product is so distinctive, it is perceived as its own category.

c.     Sixty-three percent of JUUL users did not know that this product always contains nicotine.

I.     **Despite knowledge that its products were unsafe for anyone under age 26, JUUL Deployed a Deceptive and Unfair Viral Marketing Campaign to Entice Young People to Start JUULing**

116.     As described further below, Defendant has used the same strategies perfected by the cigarette industry to sell JUUL products to young people. In particular, JUUL has both exploited regulatory loopholes and relied heavily on social media and other viral advertising tools to hook people, and in particular young persons, on its addictive e-cigarettes.

117.     To accomplish this, JUUL adopted the same themes used by Defendant Philip Morris and other cigarette companies in the industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and deleterious health effects.

118.     The Altria Defendants and Fictitious Defendants 1-13 provided the strategies, analyses, and services to JUUL enabling and in furtherance of JUUL's deceptive and unfair marketing tactics.

### 1.     Overview of Viral Marketing Campaigns and Online Marketing

119.     "Viral marketing" is defined as "marketing techniques that seek to exploit preexisting social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[59] Viral marketing is a form of word-of-mouth recommendation that harnesses the network effect of the internet to rapidly reach a large number of people. Because the goal in a viral marketing campaign is to turn customers into salespeople who repeat a company's representations on its behalf, a successful viral marketing campaign may look like millions of disconnected, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaign.

120.     Companies may use different media to transmit their viral messaging, but generally, all viral marketing campaigns tend to share similar features, including (1) a simple message—typically implied by an image—that elicits an emotional response; (2) the strategic use of marketing platforms, especially social media, to reach and engage the target audience; (3) use of content that invites participation and engagement; and (4) use of third parties to magnify the impact of a message.

121.     Typically, a viral marketing campaign will begin with a "push" by the company seeking to advertise the product, and since the advent of social media, that push is typically done through the creation of new content on a social media platform, such as Instagram, YouTube, Twitter, Facebook or other similar platform ("Social Medial Platforms").[60] A company that wants to push an ad on Social Media Platforms has a few options. First, the

---

[59] Larson, The Rise of Viral Marketing through the New Media of Social Media (2009), Liberty University Pub., *https://digitalcommons.liberty.edu/ cgi/viewcontent.cgi?article=1009&context=busi_fac_pubs* (as of July 5, 2019).

[60] Skrob, The viral marketing concept as a model for open source software to reach the critical mass for global brand awareness based on the example of TYPO3 (Aug 2005), University of Applied Science Kufstein, Austria, *http://citeseerx.ist.psu.edu/viewdoc/ download?doi=10.1.1.494.8779&rep=rep1&type=pdf* (as of July 5, 2019).

company can solicit followers to its social media pages, so that when the company posts to its feed, the content would be delivered to those followers and to those who visited the company page. Second, the company can purchase paid advertisements that were delivered to specified target audiences. Then, to amplify a message, companies can utilize other tools, such as paid influencers and strategic use of promotions and hashtags, to blanket the targeted demographic with advertisements across social media.

122.    Companies seeking to advertise new products or reach a new demographic have discovered the power of the "like" and "share" features on social media, which allow users to promote content to their own audiences. As Mark Zuckerberg, founder and Chief Executive Officer of Facebook explained: "Nothing influences people more than a recommendation from a trusted friend…A trusted referral is the Holy Grail of advertising."[61]

123.    With the advent of social media, viral marketing campaigns have become a particularly effective way to reach young people, particularly teenagers. Teenagers tend to use social media far more than adults, and tend to be more susceptible to peer pressure. 95% of teens report having use of a smart phone.[62] 45% report being online "constantly." Id. 85% use YouTube. Id. 72% use Instagram, and 69% use Snapchat. Id. Adolescents also have a far stronger herding instinct than adults. The desire to fit in and look cool means that adolescents drive new trends online. As many businesses know, young people are often skeptical of traditional advertising and the tactics of large corporations. Thus, by pushing a viral marketing campaign, these businesses can reach consumers who might ignore typical advertising and are more likely to respond to an advertisement that does not look or feel like an advertisement, but instead is a message shared by a friend, a peer, or some other person influential to the viewer.

---

[61] *https://www.ft.com/content/01341240-8cbd-11dc-b887-0000779fd2ac* (last accessed Dec. 13, 2018). See also Perkins v. LinkedIn Corp. (N.D. Cal. 2014) 53 F.Supp.3d 1190, 1210 ("One of the principal reasons such viral marketing is superior to other forms of marketing is the source: viral marketing comes from a friend or contact with whom the recipient is familiar and trusts as opposed to an unfamiliar or untrusted source.").

[62] Anderson & Jiang, Teens, Social Media & Technology 2018 (May 31 2018), Pew Research Center, *www.pewinternet.org/2018/05/31/teens-social-media-technology-2018/* (as of July 5, 2019).

124.     Companies can also take viral messaging off-line. By running simple, catchy ads with minimal text and graphic visuals, and displaying those ads in various forms, companies generate buzz and discussion, which is reinforced through social media.

**2.     The Cigarette Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors To Hook New Underage Users On Its Products.**

125.     To remain profitable, the tobacco industry must continue to woo new customers: some existing customers wean themselves from addiction and the others eventually die, so replacement customers are needed. In recent years, tobacco usage in the United States has fallen dramatically, with particularly large decreases in the youth smoking rates, which cigarette companies have been vigorously trying to counteract. The cigarette industry knows that the younger a person starts smoking, the longer they will have a customer. Historically, cigarette companies fought to increase share penetration among the 14-24 age group because "young smokers have been the critical factor in the growth" of tobacco companies, and "the 14-18 year old group is an increasing segment of the smoking population."[63]  The importance of the youth market was illustrated in a 1974 presentation by RJR's Vice-President of Marketing who explained that the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14 24 age group matures, they will account for a key share of the total cigarette volume - for at least the next 25 years."[64]

126.     It is well-established that "marketing is a substantial contributing factor to youth smoking initiation." *USA v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006).

127.     Because teenagers are at a stage in their psychosocial development when they are struggling to define their own identities, they are particularly vulnerable to image-heavy advertisements providing cues for the "right" way to look and behave amongst peers. *Id.* at 578. Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation. *Id.* at 570, 590. By making smoking a signifier of a passage into adulthood,

---

[63] Memo to: C.A. Tucker from: J.F. Hind Re: "Meet the Turk" (January 23, 1978) *http://legacy.library.ucsf.edu/tid/lve76b00* (last visited June 5, 2018).

[64] Mr. C.A. Tucker Presentation to RJRI BOfD - 9/30/74 (740930), "Marketing Plan" (1974), *www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091* (as of July 5, 2019)

tobacco companies turned smoking into a way for teenagers to enhance their image in the eyes of their peers. *Id.* at 1072

128.    The landmark *USA v. Philip Morris* case revealed that tobacco companies targeted adolescents for decades by: "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion strategies to knowingly reach teenagers." No. 99-cv-2396, ECF 5732, 2682 (D.D.C. 2008). In terms of images and themes that cater to adolescents, the court found "overwhelming" evidence that tobacco companies intentionally exploited adolescents' vulnerability to imagery by creating advertising emphasizing themes of "independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being 'cool.'" *Id.* at ¶ 2674.

129.    Thus, the industry has long used viral marketing campaigns to push its products on children, teens, and young adults. Prior to the advent of the Internet, cigarette companies engaged in "viral advertising" or "influential seeding" by paying "cool people", known as "influencers", to smoke in select bars and clubs, with the "idea being that people will copy this fashion, which would then spread as if by infection."[65] By simply paying some attractive, stylish third parties to use the product in trendy public places, tobacco companies were able to create buzz and intrigue. As word spread, the public would develop a strong association that smoking was what young, cool adults were doing.

130.    Today, cigarette manufacturers like Defendant Altria are limited in their ability to advertise in the United States, but actively use viral marketing techniques outside of the United States. For example, Japan Tobacco International, one of JUUL's early investors, launched social media campaigns including a "Freedom Music Festival" promoting Winston cigarettes in Kazakhstan Kyrgyzstan, and Jordan. Similarly, Defendant Philip Morris International, a wholly-owned subsidiary of Defendant Altria, JUUL's largest stakeholder, has used influencer campaigns in multiple countries. A campaign in Indonesia called "I Decide To"

---

[65] Golden Holocaust, 119 (citing Ted Bates and Co., Copy of a Study of Cigarette Advertising Made by J.W. Burgard; 1953, (Lorillard), n.d., Bates 04238374-8433.

has been viewed more than 47 million times online. A hashtag marketing campaign called #NightHunters in Uruguay used paid influencers to pose with menthol cigarettes and was seen by nearly ten percent of Uruguay's population.[66]

131.    An influencer paid to promote Defendant Philip Morris brands stated that Defendant Philip Morris targets a "super young profile" for its influencers . . . . the people they selected are always the youngest. They look for young people that have large groups of friends so [the social media promotional message] gets expanded more and more." *Id.* Another influencer allegedly stated that "we had a training session with the person of charge of marketing in Marlboro, she talked to us about how difficult it was for them to advertise due to all the laws in place. She also talked to us about . . . [linking] the brand to certain colors or situations." *Id.* (brackets in original).

132.    A study carried out by the campaign for tobacco-free kids, reported that "tobacco companies are secretly paying social media stars to flood your newsfeed with images of their cigarette brands." *Id.* In a nutshell, "young social media stars are paid to make smoking look cool." *Id.* A gallery of influencer posts is available at: https://www.takeapart.org/wheretheressmoke/gallery/.

133.    Similarly, in 1988 the R.J. Reynolds Tobacco Company introduced the infamous Joe Camel cartoon campaign, which faced instant criticism due to how appealing the cartoon animal was to children and teens. Joe Camel was drawn as sleek, metropolitan figure, typically wearing sunglasses or a tuxedo, or was depicted driving convertibles, gambling, or playing pool. The ads often used the phrase "Smooth Character," which to teenagers, meant he had a slick, cool personality. That in turn led to an association between smoking and coolness in the minds of young people. To ensure that message stuck, R.J. Reynolds put up billboards featuring Joe Camel near schools, and printed Joe Camel shirts, hats, and other paraphernalia, ensuring the campaign would be carried far and wide, and that kids would constantly be exposed

---

[66] *New Investigation Exposes How Tobacco Companies Market Cigarettes on Social Media in the U.S. and Around the World* (Aug 27, 2019) Campaign For Tobacco-Free Kids *www.tobaccofreekids.org/press-releases/2018_08_27_ftc* (as of July 5, 2019).

to it. Only three years after the campaign began, in 1991, the Journal of the American Medical Association published a study showing that by age six nearly as many children could correctly respond that "Joe Camel" was associated with cigarettes as could respond that the Disney Channel logo was associated with Mickey Mouse, and it alleged that the "Joe Camel" campaign was targeting children, despite R. J. Reynolds' claim (similar to the claim of Defendants here) that the campaign was directed only to adults who were already smokers of other brands.[67] At that time researchers estimated that 32.8% of all cigarettes sold illegally to underage buyers were Camels.[68] The Joe Camel campaign ended under the pressure of an impending civil trial brought by the City Attorney in San Francisco, Congressional investigation, and public pressure.[69]

134.     Cigarette companies have also known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson internal memorandum titled "Youth Cigarette – New Concepts," observed that "it's a well-known fact that teenagers like sweet products."[70] A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.[71] A 2004 study found that 17-year-old smokers were more than three times as likely as those over the age of 25 to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[72] Tobacco companies also used

---

[67] Fischer *et al.*, Brand Logo Recognition by Children Aged 3 to 6 Years (Dec 11, 1991), JAMA 266(22):3145-8, *www.ncbi.nlm.nih.gov/pubmed/1956101* (as of July 5, 2019).

[68] DiFranza *et al.*, RJR Nabisco's cartoon camel promotes camel cigarettes to children (Dec 11, 1991) JAMA 266(22):3149-53, *www.ncbi.nlm.nih.gov/pubmed/1956102* (as of July 5, 2019). (The JUULs represent an even higher percentage of all cigarettes and e-cigarettes sold to minors.)

[69] Joe Camel, Wikipedia https://en.wikipedia.org/wiki/Joe_Camel#cite_note-8 (as of July 5, 2019).

[70] Brown & Williamson official A.J. Mellman, (1983) Tobacco Industry Quotes on Nicotine Addiction, *www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes %20on%20Nicotine%20Addiction.pdf* (as of July 5, 2019).

[71] Flavored Tobacco FAQs, Students Working Against Tobacco, (citing, Sedgefield Idea Sessions 790606-790607. June 8, 1979. Bates No. 81513681/3691) *http://swatflorida.com/uploads/fightresource/Flavored%20Tobacco%20Industry%20Quotes%20 and%20Facts.pdf* (as of July 5, 2019)

[72] Klein *et al.*, Use of flavored cigarettes among older adolescent and adult smokers: United

advertisements that paired cigarettes with foods, to make it seem like cigarettes were part of a healthy meal.

> **J.      Because Advertising Fuels Youth Smoking, Tobacco Companies are Prohibited from Viral Marketing Practices and Use of Flavors**

135.      Most of the activities described in the section above are now recognized as against public policy, and thus forbidden for cigarette companies.

136.      Under the Tobacco Master Settlement Agreement ("MSA"), reached in 1998, participating manufacturers agreed not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State." MSA, § III(a). They are also prohibited from

    a.      using outdoor advertising such as billboards,

    b.      sponsoring events,

    c.      giving free samples,

    d.      paying any person "to use, display, make reference to or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media," which includes "any motion picture, television show, theatrical production or other live performance," and any "commercial film or video,"; and paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing.

137.      In 2009, the FDA banned flavored cigarettes pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. Then-FDA commissioner Dr. Margaret A. Hamburg announced the ban because "flavored cigarettes are a gateway for many children and young adults to become regular smokers."[73]

---

States, 2004-2005. (Jul 2008) Nicotine Tob Res. 10(7):1209-14, *https://www.ncbi.nlm.nih.gov/pubmed/18629731* (as of July 5, 2019).

[73] Harris, *Flavors Banned From Cigarettes to Deter Youth* (Sep 22, 2009), The New York Times, *www.nytimes.com/2009/09/23/health/policy/23fda.html* (as of July 5, 2019).

138.    The Tobacco Control Act of 2009 also prohibited sales of cigarettes to minors, tobacco-brand sponsorships of sports and entertainment events or other social or cultural events, and free giveaways of sample cigarettes and brand-name non-tobacco promotional items.

139.    A study of the cigarette flavor ban in 2017 found that the flavor ban was effective in lowering the number of smokers and the amount smoked by smokers, but also was associated with an increased use of menthol cigarettes.[74] The same study reported that 85% of adolescents who use e-cigarettes use flavored varieties.

### 2.    JUUL's Marketing Leveraged Banned Strategies Perfected by Cigarette Companies to Induce Minors and Young Non-Smokers to Purchase JUUL Products

140.    Following the successful model of its predecessors, since 2015, Defendant JUUL, in conjunction and in concert with Defendants Altria, PAX and Fictitious Defendants 1-13 involved in providing marketing services to JUUL, has been operating a long-term viral marketing campaign aimed at teenagers and young adults. This campaign extends and expands upon deceptive advertising tropes used by tobacco companies to exploit the psychological needs of consumers—especially youth—to convert them into smokers.



[74] Courtemanche *et al.*, Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use (May 2017), Am J Prev Med 52(5):e139-e146, *www.ncbi.nlm.nih.gov/pubmed/28081999* (as of July 5, 2019)



 

141.     JUUL's admitted reliance on tobacco industry documents is apparent in a collection of 82 JUUL advertisements compared to historical cigarette advertisements on Stanford's Research into Impact of Tobacco Advertising ("SRITA") website. The side-by-side comparison of numerous JUUL advertisements shows that its imagery directly parallels that adopted by cigarette manufacturers, including imagery relating to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.

142.     Because of social media, JUUL has been able to operate an even more pervasive, insidious, and successful viral marketing campaign than its predecessors in this industry. As set forth below, JUUL developed and oversaw a long-term viral marketing campaign with the intent to convince young people to purchase its products. JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

143.    JUUL carried this campaign out by: (i) intentionally designing a campaign that was simple and would trigger an emotional response, particularly with young people; (ii) intentionally designing flavored products that would appeal to teenagers and young adults; (iii) directing its advertising to teenagers and young adults on social media; (iv) utilizing third party influencers to amplify its message around the internet; (v) utilizing other social media tools, such as hashtags, to encourage participation and word-of-mouth messaging by its customers; (vi) amplifying the message through off-line advertising; and (vii) using a pricing and distribution model designed to put the product within reach of youth.

144.    JUUL's advertisements consistently withheld material information about the dangers of the product. Through this long-term advertising campaign, JUUL was able to persuade consumers, and in particular teenagers and young adults that its product was cool, while hiding from them the dangers associated with using the product. And because of the viral nature of JUUL's marketing, JUUL promotions continue to reach youth, despite JUUL's deactivation of its social media accounts.

### 3.    JUUL Advertising Used Imagery that Exploited Young People's Psychological Vulnerabilities.

145.    Throughout the relevant period, JUUL ran a consistent, simple message on social media that communicated to people, and in particular, teenagers and young adults that JUUL's products were used by popular, attractive, and stylish young adults (i.e., an idealized version of an adolescent's future self) while failing to adequately and conspicuously disclose the nature or risks of the products.

146.    In designing the campaign, JUUL knew that to increase the chances that content goes viral amongst the teen demographic, it needed to design a campaign that was simple, would generate an emotional response that would resonate with teenagers, and obscure the fact that the product was unsafe and addictive.

147.    To help it design these ads, JUUL relied on various social media marketing companies. In 2015, JUUL worked with Cult Collective, instructing Cult Collective to design an

ad campaign that would catch fire and reach customers who had "heard it all before." At the time, JUUL was a young company, competing with bigger, more established companies with large advertising budgets and high brand loyalty. The solution JUUL and Cult Collective reached was to position JUUL as a modern product that represented a better way of life for young people. That campaign was highly effective.

### 4.    JUUL's Launch Campaign Was Targeted to Create Buzz Among Young Consumers.

148.    To announce the JUUL's release in June 2015, JUUL launched the "Vaporized" advertising campaign that was aimed at a youth audience.[75] The campaign used



young, stylish models, bold colors, and memorable imagery. The models were often using hand gestures or poses that mimicked teenagers.

149.    JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

150.    The Vaporized campaign advertisements featured young, stylish models and images of attendees at JUUL's launch parties and highlighted themes of sexual attractiveness,

---

[75] Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (Jun 23, 2015) ADAGE, *http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/* (as of July 5, 2019).

thinness, independence, rebelliousness and being "cool." This Vaporized campaign targeted youth using the exact template established by the cigarette companies decades earlier.

151.     Often the Vaporized ads contained the phrase "Smoking Evolved," so that consumers, and in particular youth, would associate JUUL with high tech and the latest generation of cool products, like iPhones and MacBooks.

152.     The color scheme chosen was similar to colors used by Natural Americans Spirit Cigarettes, a leading brand of cigarettes among teenagers.

153.     Nowhere in the Vaporized ads did JUUL include any visible or prominent disclaimers about the dangers of nicotine or e-cigarettes as described above or state that JUUL was unsafe for anyone under age 26.

154.     As the Cult Collective creative director explained, "We created ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations and a brand sponsorship strategy that aligned perfectly with those we knew would be our best customers."[76]

155.     As part of the Vaporized campaign, JUUL advertised on a 12-panel display over Times Square.



156.     Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement reached between 46 states' attorneys general and cigarette

[76] Jackler *et al.*, JUUL Advertising Over its First Three Years on the Market (Jan 31, 2019) Stanford Research into the Impact of Tobacco Advertising, Stanford University School of Medicine, http://tobacco.stanford.edu/tobacco_main/publications/ JUUL_Marketing_Stanford.pdf (as of July 5, 2019). (Citing, Cult Creative JUUL case study. http://cultideas.com/case-study/juul (last accessed September 21, 2018)). (emphasis added)

companies, but JUUL took advantage of that agreement's failure to foresee the rise of vaping products to advertise its nicotine products in a manner that had already been deemed against public policy for other nicotine products.

157.    To ensure that its message would spread, JUUL utilized several other tools to put its product in front of young people. First, it ran the Vaporized campaign in the front spread of Vice magazine's cover issue. Notably, Vice bills itself as the "#1 youth media brand" in the world and is known for running edgy content that appeal to youth. JUUL also implemented a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons, imitating pop-up restaurants and bars typically aimed at attracting young, hip urban consumers. Again, this is an activity which would have been prohibited by law for a cigarette company on the ground that it was against public policy.



158.    JUUL's chief marketing officer, Richard Mumby said "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product."[77] This reliance on images of young, diverse users was specifically aimed at convincing young people who were not previously addicted cigarette smokers to purchase JUUL products, to make the use of JUUL appear fun and without long-term

---

[77] Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (June 23, 2015), AdAge, *http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/* (as of July 5, 20190

negative consequences, to position the JUUL e-cigarette as the e-cigarette of choice for young adults, and to introduce youth to the "illicit pleasure" of using the JUUL products.[78]

159.    JUUL promoted the Vaporized campaign on Facebook, Instagram, and Twitter. The Vaporized campaign included the largest ENDS smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year and generated over 400 unique promotions.

160.    JUUL also sponsored at least 25 live social events for its products in California, Florida, New York and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, was unsafe for anyone under 26, contained nicotine, carried significant health risks or was addictive. Instead, the promised attendees "free #JUUL starter kit[s]," live music, or slumber parties. Photographs from these events indicate that they drew a youthful crowd. Use of sponsored events was a long-standing practice for tobacco companies but is now forbidden.

161.    John Schachter, director of state communications for Campaign for Tobacco-Free Kids, expressed "concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design." Mr. Schachter said "the organization has noticed obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements, sponsorships and various flavors."[79]

162.    To the extent that the Vaporized advertisements disclosed that JUUL products contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, if the same ads had been touting cigarettes, they would have been required to display a health warning in high contrast black and white in a box comprising 30% of the image.

---

[78] Additional images and videos are available at *http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php* (as of July 5, 2019).

[79] Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (June 23, 2015), AdAge, *http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/* (as of July 5, 20190

**5.**          **JUUL Gave Away Free Products to Get New Consumers Hooked**

163.          JUUL distributed free starter packs at the live social events described above in paragraph 125—conduct forbidden for a cigarette company under the Tobacco Master Settlement Agreement, because it lured young people into nicotine addiction and related harms. BeCore, one of the firms responsible for designing and implementing JUUL's live events reported that "on average, BeCore exceeded the sampling goals set by JUUL . . . average number of samples/event distributed equals 5,000+."[80] (emphasis added). At these events, BeCore distributed the appropriately-named JUUL "Starter Kits," which contain a JUUL and 4 JUULpods of varying flavors. If BeCore indeed gave away 5,000 Starter Kits per event, JUUL effectively distributed the nicotine equivalent of 20,000 packs of cigarettes at each of the 25 events described above—or the equivalent of 500,000 packs of cigarettes at all 25 events.



---

[80] Jackler *et al.*, JUUL Advertising Over its First Three Years on the Market, Stanford Research into the Impact of Tobacco Advertising, Stanford University School of Medicine (Jan 31, 2019), *http://tobacco.stanford.edu/tobacco_main/ publications/JUUL_Marketing_Stanford.pdf* (as of July 5, 2019).



164.	Though JUUL publicly acknowledged in October 2017 that it is unlawful to free samples of its products at live events, JUUL continued to do so, sometimes through $1 "demo events." Notably, promotions of this kind are prohibited for cigarette companies by the MSA.

165.	The effect—and purpose—of JUUL's Vaporized giveaways was to flood major cities with free product which by its addictive nature would hook tens or hundreds of thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JUUL's message to their friends via word of mouth and social media. Similar campaigns have long been used by drug cartels. This campaign unconscionably flooded cities with free samples of an addictive product, with distribution focusing on the youth market. As a foreseeable result, JUUL products ended up in the hands of non-smokers and youth, like Plaintiff, who used the products, became addicted to nicotine and suffered severe health consequences.

**6.    JUUL Portrayed Its Products as Status Symbols.**

166.    As tobacco companies have long known, young people—and adolescents in particular—find security and a sense of identity in status symbols. Even after the "Vaporized" campaign, JUUL's later advertisements mimicked the look and feel of the "Vaporized" ads to foster the image of JUUL e-cigarettes and JUULpods as sleek, stylish, status symbol. For example, JUUL developed and ran a series of advertisements that were simple images of stylish young people using JUUL.

167.    All of these ads communicated to teenagers that JUUL was a product being used by cool, modern young people, which JUUL, like all cigarette companies, knows is a powerful message. None of these ads prominently disclosed the dangers of using JUUL.

168.    Other JUUL advertisements relied on graphic images with the look and feel of advertisements by Apple, Google, and similar tech companies with progressive and modern reputations. Again, these ads resonated with teenagers as well, as they made JUUL, and especially the flavored pods, look like cool gadgets or software, something akin to an iPhone or a hot new app to download. Like the other ads, none prominently disclosed the dangers of using JUUL.

169.    JUUL also consistently compared the JUUL to the iPhone through statements like "the iPhone of e-cigarettes," which JUUL posted on its website, distributed through social media, and disseminated through its email campaign. The iPhone is the most popular smartphone among adolescents, with 82% of teenagers preferring Apple's phone over the competition. JUUL's advertising images frequently include pictures of iPhones and other Apple devices, including iPads, Beats Headphones, MacBook laptops. Through these images, JUUL presented its image a "must have" technology product and status symbol, instead of a nicotine delivery system.

170.    Beyond triggering an emotional response in teenagers, all of JUUL's social media advertising had three additional things in common. First, through the use of clean lines, artistic arrangements, minimal text, and eye-catching graphics, JUUL ensured that the

advertisements would jump out to distracted teenagers who scrolled crowded social media pages on their phones and browsers.

171.    Second, all of JUUL's advertisements reflect an understanding that social media users in general, and teenagers in particular, do not typically read long blocks of text on social media, and rely more heavily on imagery instead of text to convey a message. Many of the ads did not include any warning about the dangers of JUUL or suggest to teenagers that the product contained nicotine.

172.    Moreover, where JUUL's advertisements appeared to contain such a disclaimer, this disclaimer was not typically seen when viewing social media due to the way the posts appear in phones and browsers. In particular, Facebook and Instagram typically only present to users the image and a couple lines of text, and viewers who want to see the entire post must click on it to open it up and read the rest.

173.    JUUL's Instagram advertisements obscure those nicotine warnings by placing them in a location that requires the user to open up the post and read it. As can be seen in JUUL's Instagram ads, the company consistently used brief text at the beginning of a post so that it would to be a complete sentence with no further content. Thus, the disclaimer was never visible to anyone viewing the posts in their main feed, and it was only seen by a limited number of people who elected to open the post and then read what was there. Notably, on Twitter, a Social Media Platform that is geared towards reading text, and on Facebook, where some users do read text, JUUL typically did not include the disclaimer in its advertisements.

174.    Third, JUUL's advertisements were typically creative, giving them the look and feel of "art." Thus, teenagers were drawn to the advertisements, holding their gaze on the ads for longer periods of time, and being more inclined to share the advertisement with others in their networks, thus accomplishing JUUL's goal: turning consumers into salespeople.

175.    Even JUUL's newer "alternative for adult smokers" tagline suggests to adolescents that JUUL-use is a symbol of status as an adult, which happens to be an advertising theme cigarette companies peddled to youth for decades.

### 7.    JUUL Used Flavors and Food Imagery to Attract Teenagers and Downplay Risks

176.    JUUL sells its JUULpods in a variety of sweetened flavors. It even advertised some of its flavors as though they were desserts in themselves. For example, it advertised its crème brulee flavor using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." JUUL used imagery that looked like ads for a trendy coffee shop or

 

restaurant.

177.    Again, none of these advertisements prominently disclosed that JUUL was addictive and unsafe.

178.    The tobacco industry has long known that sweetened cigarettes attracted young smokers. As discussed above, the FDA banned flavored cigarettes for that reason.

179.    The use of flavors that appeal to youth has a marked effect on e-cigarette adoption by young "vapers." A national survey found that that 81 percent of youth aged 12-17 who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month.

180.    Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[81] Another peer-reviewed study concluded that

---

[81] Ambrose *et al.*, Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, *2013-2014* (Oct 26, 2015), JAMA 314(17):1871-1873 *https://jamanetwork.com/journals/jama/fullarticle/2464690*

"Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their nonvaping peers, a new study has found."[82]

181.    Research also shows that when youth see flavored ENDS liquids advertisements, they believe the advertisements and products are intended for them.[83]

182.    The use of attractive flavors foreseeably increases the risk of nicotine addiction, and e-cigarette related injuries, as traditional cigarette product designs aimed at reducing the unpleasant characteristics of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to contribute to the risk of addiction.[84] Worse still, adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was tobacco-flavored.

183.    JUUL's kid-friendly flavors included Fruit Medley, Mango, "Cool" Mint, "Cool" Cucumber and Menthol. 74% of youth surveyed in a recent study indicated that their first use of a JUUL was of a flavored pod.[85] More than half of teens in a nationwide survey by the Wall Street Journal stated that they use ENDS because they like the flavors.

184.    When JUUL released what are now the two most popular flavors among youth: Mango and "Cool" Mint ("Cool Mint"), JUUL promoted those flavors on Instagram, Twitter, YouTube and Facebook—all of which are skewed toward young audiences.

185.    JUUL's Mango pods quickly became the runaway favorite among youth, including P.O. The Mango pods are so popular that, incredibly, they noticeably increased the use

---

[82] Primack *et al.*, Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults (Apr 2018), Vol. 131, Issue 4, 443.e1–443.e9, *www.amjmed.com/article/S0002-9343(17)31185-3/fulltext*

[83] McKelvey *et al.*, Youth say ads for flavored e-liquids are for them (Aug 29, 2018), Addict Behav. 91:164-170, *www.ncbi.nlm.nih.gov/pubmed/30314868* (as of July 5, 2019)

[84] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General, Chapter 4, Nicotine Addiction: Past and Present (2010) *www.ncbi.nlm.nih.gov/books/NBK53017/* (as of July 5th, 2019).

[85] McKelvey et al., Adolescents and young adults use in perceptions of pod-based electronics cigarettes (Oct 19, 2018), JAMA Netw Open. 1(6): e183535 *www.ncbi.nlm.nih.gov/pmc/articles/PMC6324423/* (as of July 5, 2019).

of the word "mango" on the internet as a whole. Starting in early 2017, Google Trends reports a nearly five percent increase in year-over-year use of the word "mango" online.[86]

186.    "Cool" Mint became youths' second youth favorite flavor. The 2018 Duell Study found 94 mg/mL nicotine in a JUUL "Cool" Mint pod – nearly double the amount on JUUL's "5% strength" label would suggest.

187.    JUUL's advertising emphasized the flavors of its sweetened nicotine pods. Leveraging the flavors, JUUL advertised JUULpods as part of a meal, to be paired with other foods. In late 2015, JUUL began a food-based advertising campaign called "Save Room for JUUL." A play on the expression "save room for dessert," JUUL's campaign focused on the JUULpods' sweet flavors, and pairing them with foods. JUUL described its crème brulee nicotine pods as "the perfect evening treat," using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." In one 2016 email, JUUL bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."

188.    JUUL similarly promoted the Fruit Medley pods using images of ripe berries. JUUL described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint," and in a Facebook advertisement dated July 10, 2017, JUUL urged customers to "start your week with cool mint juulpods."[87] Along with the bright green caps of the "Cool" Mint JUULpods, the Facebook ad included an image of a latte and an iPad. *Id.*

189.    JUUL even hired celebrity chefs to provide pairing suggestions for JUUL flavors. On Instagram and Twitter, JUUL boasted about "featured chef" Bobby Hellen creating a "seasonal recipe to pair with our brulee pod." On Facebook, JUUL posted a link to an article on porhomme.com about "what our featured chefs created to pair with our pod flavors."[88] JUUL

---

[86] *https://trends.google.com/trends/explore?date=2014-06-01%202018-12-05&geo=US&q=mango*

[87] *https://airtable.com/tblkPVYIp5AFNLrTy/viwFFlmOJSzXHskhz/recEYkrXbuSCdZB0h*

[88] Facebook_10, *https://airtable.com/tblkPVYIp5AFNLrTy/viwFFlmOJSzXHskhz/rec0vT9owbjQeVUuY.*

tweeted repeatedly about its flavors and encouraged its social media followers to share their preferred pairings.



190.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture. JUUL's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee. This comparison to coffee was an intentional effort to downplay and minimize the risks of JUUL, suggesting it was no more risky than coffee; a tactic utilized by tobacco companies for decades to equate nicotine with caffeine.

191.    By positioning JUULpods as a delicious treat rather than a system for delivering a highly addictive drug with dangerous side effects, JUUL unfairly led consumers to the conclusion that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

192.    By modeling its nicotine pods' flavor profiles on sweets, naming its nicotine pods after those sweets, and using images of the sweets in JUULpod advertisements, JUUL conditioned viewers of its advertisements to associate JUUL with those foods. Through this conditioning process, Defendant sought to link the sight or mention of JUUL products to mental images of the fruits and desserts in JUUL's advertising, which would in turn trigger food-based

physiological arousal including increased salivation and heart rate. These physiological responses, in turn, would make JUUL use more appealing.

193.    By 2017, JUUL knew that the foreseeable risks posed by fruit and candy-flavored e-liquids had materialized. A significant percentage of JUUL's customers included adolescents who overwhelmingly preferred Fruit Medley and Crème Brulee over Tobacco or Menthol.[89] Instead of taking corrective action or withdrawing the sweet flavors, JUUL capitalized on youth enthusiasm for its products.

194.    JUUL disingenuously asserts that it did not intend its flavors to appeal to young people, including Plaintiff. After 11 senators sent a letter to JUUL questioning its marketing approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and Mango, JUUL visited Capitol Hill and told senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Sen. Dick Durbin (D-Ill.). JUUL's statements to Congress—which parallel similar protests of innocence by tobacco company executives—were false.

195.    In November 2018, in response to litigation and other mounting public pressures, JUUL announced that it had "stopped accepting retail orders" for many of its flavored JUULpods, such as mango, crème brulee, and cucumber.[90] But JUUL's promise is misleading. JUUL has only refused to sell them directly to retailers, but it still manufactures and sells the JUULpods. The pods can still be purchased on its website by persons under age 26. JUUL also continues to sell "Cool" Mint in gas stations knowing that the flavor is incredibly popular with youth and will become the de facto favorite if access to other flavors is removed.

196.    The only responsible solution to prevent flavored JUULpods from getting into the hands of young people is to stop manufacturing them.

---

[89] Truth Initiative, *JUUL fails to remove all of youth's favorite flavors from stores* (Nov 15, 2018), *https://truthinitiative.org/news/juulfails-remove-all-youths-favorite-flavors-stores* (as of July 5, 2019).
[90] Kaplan & Hoffman, *Juul Suspends Selling Most E-Cigarette Flavors in Stores* (Nov 13, 2018), The New York Times, *www.nytimes.com/2018/11/13/health/juul-ecigarettes-vaping-teenagers.html* (as of July 5, 2019).

**8.    JUUL Developed Point-of-Sale Advertising That Emphasized the Products' Positive Image Without Adequately Disclosing Its Nature and Risks.**

197.    The cigarette industry spends $8.6 billion a year in point-of-sale ("POS") promotions—or almost $990,000 every hour.[91] In a 2009 study of adult daily smokers, unintended cigarette purchases were made by 22 percent of study participants, and POS displays caused nearly four times as many unplanned purchases as planned purchases. *Id.* at 4. Younger smokers, in particular, are more likely to make unplanned tobacco purchases in the presence of POS advertising. *Id.*

198.    Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to POS tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed. Frequent exposure to tobacco product advertising and marketing at retail normalizes tobacco and smoking for youth over time and makes them more likely to smoke. POS marketing is also associated with youth brand preference. Research shows that young adult smokers prefer the tobacco brands marketed most heavily in the convenience store closest to their schools.  Before its launch in 2015, JUUL and Cult Collective developed innovative packaging and creative in-store displays that would carry their message through into stores.

199.    In particular, they designed bright, white packages. The packaging looked similar to iPhone packaging, which JUUL knew would resonate with young people, and because it was solid white, the packaging stood out and caught people's eyes when displayed in store shelves. This packaging buttresses Defendant's online marketing of JUUL e-cigarette as "the i-Phone of Ecigs," thereby framing them as a cool, fashionable item to own and use. JUUL posters and signs at the point of sale also promoted JUUL's flavors. From 2015 through late 2018, JUUL promoted JUUL products and JUUL flavors at the point of sale without disclosing that the products contained nicotine or warning that the products could lead to addiction. Instead,

---

[91] *The Truth About Tobacco Industry Retail Practices,* Truth Initiative, *https://truthinitiative.org/sites/default/files/media/files/2019/03/Point-of-Sale-2017_0.pdf* (as of July 5, 2019)

JUUL's promotions displayed the colorful JUULpod caps and their food-based names while omitting that JUUL delivers nicotine, is addictive, carries risks of stroke and other cardiovascular events, and is unsafe for anyone under age 26.



200.    For many, JUUL's POS materials provided an introduction to the brand. Because JUUL's POS materials omitted the most material features of JUUL's product—that it is a powerfully addictive nicotine delivery system, unsafe for anyone under age 26—adolescents who saw JUUL's POS and were later offered a JUUL would have no reason to think that what they were being offered JUUL contained nicotine, or posed risks of addiction, or was unsafe.

**9.     JUUL Used Social Media to Inundate Target Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products**

201.     JUUL not only designed its advertising with an eye to what might be appealing to young people, but set about disseminating those ads to ensure that young people see them. JUUL set out to advertise on at least three major social media platforms: Instagram, Facebook, and Twitter, and disseminated the information in various ways across the platforms.

202.     On information and belief, JUUL maintains active accounts on most social media platforms, including Instagram, Facebook, and Twitter, where JUUL tweeted nearly 5,000 times in 2017 alone. As of 2016, 76 percent of American teens age 13-17 used Instagram, 66 percent of teens use Facebook, and 44 percent of teens use Twitter.[92] While JUUL continues to maintain its Twitter page, it deleted nearly all content from its Instagram and Facebook pages around November of 2018, in response to lawsuits.

203.     JUUL was able to deliver content directly on social media using two approaches. First, it could post its advertisements directly to its own page, where it would be viewed by those who followed JUUL, and those who shared its posts ("Unpaid Advertising"). And it could engage in paid advertising, whereby it could target specific demographics of people to ensure they received its advertisements ("Paid Advertising").

204.     With respect to Unpaid Advertising, Instagram was the centerpiece of JUUL's teen-focused advertising blitz. Instagram is used overwhelmingly by teenagers. At least 72% of teenagers in the United States have an Instagram account, and at least 63% of teenagers between the ages of 13 and 17 use Instagram every day.[93] While increasingly more adults are using Instagram, this has been a recent development, and thus, advertisers typically only use Instagram if they are interested in marketing to young people, especially teenagers.

---

[92] Snapchat And Instagram Are The Most Popular Social Media Platforms Among American Teens, The Associated Press-NORC Center for Public Affairs Research, *http://apnorc.org/projects/Pages/HTML%20Reports/instagram-and-snapchat-are-most-popular-social-networks-for-teens.aspx* (as of July 5, 2019)

[93] Smith & Anderson, Social Media Use in 2018: A majority of Americans use Facebook and YouTube, but young adults are especially heavy users of Snapchat and Instagram (Mar 1, 2018), Pew Research Center, *www.pewinternet.org/2018/03/01/social-media-use-in-2018/* (as of July 5, 2019).

205.     Because of the way Instagram delivers content, Instagram allowed for fast, effective delivery and sharing of its graphic, simple messages. Users would see these images simply by scrolling through their feeds.

206.     JUUL also disseminated Unpaid Advertising across social media through its use of hashtags. Hashtags are simple phrases preceded by a #, and they operate as a way of cataloguing posts. Authors of posts use hashtags if they want their posts to be discovered and seen by people outside of their networks. On most social media platforms, users can find information by doing a search for a hashtag with that key word. Thus, people interested in JUUL, could enter into the search bar on most Social Media Platforms "#JUUL" to find posts that include that hashtag. Instagram takes it one step farther and allows users to set up their accounts so that posts with a certain hashtag are automatically delivered to their feed.

207.     JUUL's hashtag marketing played a central role in the viral spread of JUUL between teenagers. The use of hashtags in social media advertisements "can be used to get your content in front of a bigger audience, raise awareness about your brand, target a very specific group of people, boost your SEO, and use hot trends and topics to your advantage.[94] Hashtags are "the best weapon in your arsenal, aside from influencer marketing" for getting content "in front of its intended audience." Id. Through hashtag marketing, brands can join in on trending topics, engaging "an insane amount of readers" by using "hashtags which aren't closely related to your industry" by, e.g., using holiday-related hashtags. Id. By using "branded hashtags" that include the company's name or a specific product, advertisers can monitor the performance of specific campaigns. Another advantage of branded hashtags is user-generated content: "Every time a user puts one of your branded hashtags inside one of their posts, they are increasing your presence on social media" by promoting the branded hashtag, and the related content, to the user's followers. Id. (emphasis added). Through successful hashtag marketing campaign, brands

---

[94] Ryan, *Hashtag Marketing: How to Use Hashtags for Better Marketing Campaigns*, Mention, *https://mention.com/blog/hashtag-marketing-how-to-use-hashtags-for-better-marketing-campaigns/* (as of July 5, 2019).

can create communities through which "followers will not only be able to communicate via chat or messages, but also connect with each other by using your hashtag." *Id.* (emphasis in original).

208.     From 2015 through 2018, JUUL used hashtag marketing consistently on Twitter, Instagram, and Facebook to promote its products. In various posts, JUUL would slip in hashtags so that their posts would be found by young people. This post is not a paid advertisement, but a post to JUUL's Instagram feed. JUUL used #TBT, which is an acronym for "Throwback Thursday." Throwback Thursday is a popular meme on social media, and teenagers are especially likely to understand it and use it. Thus, any teenager who had elected to follow the hashtag TBT would see this post when they logged into Instagram that day. Moreover, no one would see any warning regarding nicotine unless they actually opened the post. JUUL frequently used other hashtags that would be used by teenagers to push their product to them across social media, such as #icymi ("in case you missed it").

209.     JUUL also used hashtags to convert young users into salespersons through unpaid viral marketing.

210.     Despite JUUL deactivating some of its social media accounts in November 2018, "the vibrant community of #juul lives on, including an abundant representation of youthful postings."[95] "The JUUL hashtag lives on. It's immortal. It's still viral in peer-to-peer teen promotion."[96]

211.     In disseminating Paid Advertising, the Social Media Platforms allow companies like JUUL to engage in micro-targeting, i.e., to select precisely what demographics of people should be exposed to its advertising. Social Media Platforms create internal profiles for the consumers that use them, tracking their online activity to determine their likes, habits, and purchasing power. When advertisers pay to disseminate ads, they can choose to target those ads so that they are received only by people whose digital footprint suggests an interest or

---

[95] Robert K. Jackler, M.D. et al, JUUL Advertising Over Its First Three Years on the Market (Jan. 21, 2019).
[96] Quote by Robert K. Jackler, M.D., in https://www.vox.com/2019/1/25/18194953/vape-juul-e-cigarette-marketing.

predisposition to the product. JUUL would have had the option to exclude teenagers. It also could have elected to narrow its target audience to people with an interest in tobacco products, if it wanted to reach and convert non-smokers. Or it could target a broader audience of people whose digital footprints did not reveal that they were smokers.

212.    While JUUL's precise targeting methods are unknown, on information and belief, young people like Plaintiff are known to have been exposed to JUUL's Paid Advertising while on social media, suggesting that JUUL did not narrow its target audience to adult smokers

213.    Moreover, regardless of to whom JUUL targeted paid advertisements, JUUL's use of Paid Advertising was aggressive, and had the inevitable result of reaching teenagers, including Plaintiff. Paid advertising can be shared and liked just as Unpaid Advertising. JUUL relentlessly advertised to its targeted audience, across all Social Media Platforms. Plaintiff saw JUUL advertising on a near daily basis, regardless of what platform he used. The continual use of Paid Advertising increased the pressure to buy, and it made quitting harder due to the fact that he was exposed to the advertising all day long through his phone and other personal electronic devices.

### 10.    JUUL Exploited Social Media to Target Young People

214.    To broaden the reach of its campaign, JUUL used "influencers" to push the product to young people. Influencers are "high-social net worth" individuals who have developed large social media followings – i.e., the "cool kids" of the social media world. People follow influencers because they tend to deliver lots of high quality, interesting photos and content, and because they are known to be trend-setters.

215.    Viewed as tastemakers and trendsetters by their followers, influencers are prized sources of brand promotion on social media networks. Companies seeking to market products often will pay influencers to advertise their products, similar to the ways in which they utilize "product placement" in movies. They seek out influencers with large amounts of followers in their target demographic, and will offer these influencers money or other deals to promote their products. The influencer then will create various posts on social media using the

product. Typically, these posts are images of them using the product, but sometimes these posts will include videos, longer written reviews, or other information about the product. Influencers often include in these posts company-endorsed hashtags or links to the company's website to try to direct their followers to learn more. The company gets the benefit of having word-of-mouth advertising, and the influencer is able to attract more followers because those followers want to stay in the loop about new products and deals. While influencers operate on all Social Media Platforms, most of them rely primarily on Instagram.

216.     JUUL relied on influencers to carry out its viral marketing campaign. JUUL's reliance on influencers appears to have begun around June 2015, when JUUL listed a position on its website for a three-month Influencer Marketing Intern.[97] JUUL described the position as follows: "The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer engagements. . . to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social media channels, etc." (*Id.*). JUUL's efforts to solicit influencers appears to have been underway for years; until December 2018, JUUL's website still called for individuals to "Join the JUUL influencers." Applicants were required to disclose their profile information for Instagram, Twitter, and Facebook, as well as various other blog and vlog platforms, suggesting that JUUL was interested in understanding whether the influencers could help JUUL reach its targeted youth demographic.

217.     JUUL's outreach had its desired impact, as it was able to line up influencers to promote its products to teenagers, while spreading pictures of cool, young people using JUUL. In addition to all the means above, JUUL paid influencers and celebrities to promote JUUL, generating even more attention and exposure to young people, and reinforcing that the products were safe, cool, and fun.

218.     JUUL used or ratified multiple accounts across many social media sites to reach young people, even encouraging users to JUUL at school.

---

[97] *https://www.internships.com/marketing/influencer-marketing-intern-i7391759* (last accessed Nov 14, 2018).

219.    JUUL also enjoyed the benefit of third-party promoters who reached hundreds of thousands of young people.

220.    Cigarette companies are prohibited from conducting any of the practices described above under the Tobacco Master Settlement Agreement. Activities such as product placement in performances and professional videos have been identified as against public policy for nicotine products.

221.    One recent study concluded that JUUL was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . because there are no restrictions," on social media advertising.[98]

### 11.    JUUL Utilized a Pricing and Distribution Model Designed to Put the Product Within Reach of Youth Without Disclosing Harms.

222.    Cigarette companies for years sold youth-brand cigarettes at lower prices that young smokers could afford and used discounts and other promotions to ensnare them. JUUL is no different. It not only designed a marketing campaign to reach young people and entice new smokers, but it priced its products in such a way to ensure they would buy them.

223.    A pack of four JUULpods, which, according to JUUL, is the equivalent of four packs of cigarettes, costs approximately $13-$20. JUUL's website charges $15.99 for a pack of JUULpods, or about $4 per JUULpod. However, where P.O. resides, a pack of Mango JUULpods can go for over $40.00 at a convenience store.  By contrast, a single pack of cigarettes in Connecticut costs approximately $9, and $13 in New York.

224.    For years, JUUL directed all of its product to gas stations. JUUL knows that teenagers and those new to smoking are likely to frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL would increase the chances that these people would purchase the product.

225.    To further drive curiosity and interest, and make it so its target audience, and especially teenagers, would purchase JUUL, JUUL instructed retailers to display the product in

---

[98] Kelley, *JUUL Sales Among Young People Fueled by Social Media, Says Study* (Jun 4, 2018), The Washington Times, *www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/* (as of July 5, 2019).

an unusual fashion. Whereas cigarettes and other tobacco products have long been kept behind the counter, JUUL designed display cases that would sit on store shelves. JUUL intentionally designed the clear display cases so that the bright white, sleek packaging and the flavors would catch consumers' eyes and make them interested in purchasing the product.

226.    JUUL knew that by asking retailers to display JUUL products separate from other tobacco products, and within arms' reach, it would also suggest to consumers that JUUL was safer than traditional cigarettes and that it was not an addictive drug.

### K.    JUUL Used Non-Age-Restricted Emails to Promote and Track Its Products

227.    Between 2015 and 2018, JUUL sent around 200 email promotions to customers and potential customers. JUUL's email subscription list was not age-restricted and, until recently, users who failed the age verification requirements on JUUL's purchase page were nevertheless added to JUUL's mailing list and emailed a coupon for a discount on a Starter Kit. The JUUL emails promoted retail locations, flavors, discounts, and "refer a smoker" programs. The emails also promoted JUUL's find-a-store locator.

228.    JUUL also used emails to distribute surveys. Because JUUL's emails were not age-restricted, neither were their surveys. On information and belief, JUUL thus collected data from minors. JUUL paid customers, including youth, up to $30 to complete some surveys.

### L.    JUUL Knew that its Scheme to Attract Young Smokers Like Plaintiff had Worked

229.    Within a few months of the JUUL's commercial release in June 2015, a former JUUL executive reportedly told the New York Times that JUUL "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[99]

230.    JUUL tracked and closely monitored usage among youth through social media, online surveys, YouTube videos, hashtags, likes, email lists, and myriad other sources.

---

[99] Richtel & Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to yout*h (Aug 27, 2018), The New York Times, *www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html* (as of July 5, 2019).

231.     By the end of 2015, young people had posted tens of thousands of videos on YouTube demonstrating ways to "JUUL in school" and in other locations without teachers, coaches or parents finding out.

232.     From the outset, JUUL was well-aware that a huge portion of its sales was going to persons like Plaintiff under age 26, but did nothing to curb, prevent, mitigate the harms that its products could cause.

**M.     JUUL Created an Youth Vaping Epidemic and Exposed a New Generation to the Dangers of Nicotine Products.**

233.     JUUL's marketing and product design efforts have been wildly successful. Since its launch, JUUL is now the fastest growing e-cigarette in the country. Because the JUUL delivers more nicotine in a shorter amount of time than any other product, delivers that nicotine in a sweetened vapor that causes no irritation, and does so through a concealable device that can be consumed discretely in class, at home, and in the car, nicotine naïve users like Plaintiff frequently spiral into patterns of addiction with no historical precedent. It is not uncommon for teenagers, like Plaintiff, to consume two JUULpods a day, the nicotine equivalent of at least as many—and likely more—packs of cigarettes.

234.     Because JUUL's marketing turned the JUUL into a status symbol for teens, the acute nicotine addiction a JUUL fosters is frequently reinforced by the idea—which JUUL spread—that JUUL use is what "cool" popular kids do in high school. As a result, the medical community has found itself ill-equipped to develop a treatment for JUUL-addicted youth, as evidenced by a January 2019 FDA-sponsored meeting concerning the role of drug therapies in treating e-cigarette use.

235.     The vaping epidemic caused by JUUL has swept the entire nation in a short period of time. On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent Electronic Nicotine Delivery System

("ENDS") vaping from 2017 to 2018 were the *"largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."* [100]

236.     The percentage of 12th grade students who reported vaping nicotine almost doubled between 2017 and 2018, rising from 11% to 21%. The ten-percentage-point increase in 12th grade students who reported vaping nicotine (an indicator of nicotine addiction) is "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade." *Id.* "One in five 12th graders vaped nicotine in the last 30 days in 2018." *Id.* And because JUUL controls over 50% of the e-cigarette market, and was released immediately prior to the jump in vaping prevalence from 11% of teens to 21%, the entire increase in vaping prevalence since 2016 is attributable to JUUL.

237.     FDA Commissioner Dr. Scott Gottlieb has described the increase in e-cigarette consumption as an "almost ubiquitous – and dangerous – trend" that is responsible for an "epidemic" of nicotine use among teenagers. [101] The rapid –indeed infectious- adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products." *Id.* The Commissioner identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products." *Id.*

238.     Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."[102]

239.     Even more troubling are the challenges associated with getting kids to quit JUUL once they start. JUUL's aggressive social media campaign puts JUUL advertisements

---

[100] Prieur, National Adolescent Drug Trends in 2018 (Dec 17, 2018), Institute For Social Research, The University of Michigan, *https://isr.umich.edu/news-events/news-releases/national-adolescent-drug-trends-in-2018/* (as of July 5, 2019).

[101] FDA launches new, comprehensive campaign to warn kids about the dangers of e-cigarette use as part of agency's Youth Tobacco Prevention Plan, amid evidence of sharply rising use among kids, U.S. Food & Drug Administration, (Sep 18, 2018), *www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm* (as of July 5, 2019)

[102] Surgeon General's Advisory on E-cigarette Use Among Youth (last updated Apr 9, 2019), CDC, *www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory/index.html (as of* July 5, 2019).

before them every day, all day. Those that want to stop thinking about it are faced with advertising when engaging in their regular activities. And even while JUUL has purportedly stopped advertising on social media in recent months, its hashtags, imagery, and impact live on, as there remain nearly 524,000 posts and counting on Instagram featuring the #juul hashtag as of July 8, 2019.

240.     Moreover, many medications for breaking nicotine addictions are approved only for adults.

241.     The inadequacy of quality control and other standards in the manufacture of JUUL raises additional, serious public health concerns regarding youth access and use. For instance, actual nicotine concentrations in JUUL can vary from advertised amounts, sometimes significantly exceeding the advertised concentration of nicotine. Because the concentration of nicotine in JUUL pods is already staggeringly high and potent, concentrations over the advertised amounts can increase the risk that users could become addicted or experience nicotine poisoning, or experience a spike in blood pressure which can result in serious illness or death. A related concern is the lack of full disclosure of all ingredients in e-liquids, some of which can also cause harm when inhaled.

**N.     JUUL Implemented its Advertising Strategy with the Advice and Services of Defendants**

242.     In order to implement such a diverse, wide-ranging advertising scheme, designed for the sole purpose of delivering its JUUL e-cigarette products to young consumers, JUUL worked in concert with an array of marketing, research and development, and distribution professionals.

243.     JUUL's advertising and marketing relied on the ideas, strategies, and advice of marketing and public relations entities.

244.     These entities, Defendant Altria and Fictitious Defendants 1-13, willingly and knowingly provided advertising expertise to JUUL, fully aware that JUUL would use these

advertisements to target, sell to, and ultimately increase the number of young people consuming nicotine via its products.

245.    Defendants used their knowledge of how young adults use social media, interact with social media posts, and are influenced by such posts, to create an advertising strategy designed to consistently, relentlessly, and exploitatively induce young adults and teenagers to use JUUL's JUUL e-cigarette products.

246.    Defendant Altria and Fictitious Defendants 1-13 provided their marketing services knowing that the marketing slogans, advertisements, and advertising methods they created were deceptive, provided no meaningful warning to users, and would necessarily mislead or otherwise falsely suggest that JUUL's JUUL e-cigarette products were not harmful, not addictive, or otherwise safe for use.

247.    Defendants expended time, money, and effort in order to design, create, and implement and pervasive advertising scheme whose sole purpose was to exploit and influence the minds of young adults into associating social status, popularity, desirability, and success with the purchase and consumption of JUUL's JUUL e-cigarette products.

248.    Defendants essentially used the playbook of cigarette and tobacco product advertising implemented by companies such as Defendant Philip Morris, in order to market JUUL e-cigarette products to young adults.

### O.    JUUL Unraveled Decades of Progress in Reducing Teen Smoking by Exploiting Regulatory Loopholes.

249.    The teen vaping epidemic was by design, not by accident.

250.    When JUUL was first developed, the FDA's regulations on tobacco products were vague as to whether they applied to vaping devices. Because the regulations did not explicitly identify electronic vaping devices that dispensed tobacco and nicotine as a regulated product, JUUL interpreted those regulations to mean that it could sell its dangerous products to anyone, regardless of their age, and that it did not have to comply with the advertising and labeling restrictions that restricted other tobacco companies.

251.    As other vaping companies began to enter the market, JUUL no doubt knew that this gray area was unlikely to stay gray for long. Knowing that the clock was ticking, JUUL went on a wild spree to get as many young people addicted as possible while it still viewed itself as "unregulated." The aggressive advertising described above was designed not just to sell the products to teenagers, but to sell the product to as many teenagers as possible while it still had a plausible defense to any assertion that it was violating FDA regulations. By hooking teens, JUUL not only ensured it would have loyal consumers for decades, but those teens would influence their friends.

252.    Moreover, by pumping social media platforms full of images of cool, young people having fun while JUULing, JUUL ensured that everyone from adults to young children, would think JUULing was a cool, fun, and safe activity. Just as RJR Reynolds learned with Joe Camel, even very young children would in turn be more likely to form strong, positive associations with the tobacco product and be more susceptible to trying it in the future.

253.    In 2017, the FDA announced that it would be taking steps to regulate vaping devices such as JUUL and other ENDS. Regulations were proposed and ultimately went into effect in late 2018. But the damage was done, and it was too late for minor Plaintiff P.O.

254.    In 2018, after the FDA opened an investigation and lawsuits were filed, JUUL set out to rewrite its history. It has removed from its website and much of the internet images of glamorous young models seductively exhaling clouds of vapors. JUUL's website now pictures middle-age adults in non-glamorous settings and suggests that JUUL solely exists for the benefit of adult smokers looking for an alternative. Although JUUL now markets its product as a smoking cessation device ("Switch to JUUL"), it has not received FDA approval as a modified risk tobacco product or as a nicotine replacement therapy, and JUUL's e-cigarette has not participated in any FDA approval process analyzing its risks and benefits. While JUUL has also announced some half-hearted voluntary measures to reduce access to young people, the cat cannot go back in the bag. The viral marketing campaign and images live on, the candy flavors

are still available, and the product remains designed to maximize the nicotine delivery for young people, leading to devastating health consequences.

255.    To this day, JUUL has not disclosed the health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of young people in harm's way.

**P.    JUUL's Conduct Harmed P.O.**

256.    Starting JUUL in 2016, when he was approximately 17, Plaintiff had been seeing advertising and promotions for JUUL and JUUL accessories in his social media feeds, and at local convenience stores near his home and school, especially the one out front of his high school. These ads and promotions made JUULing seem fun, healthy and cool.

257.    Plaintiff first tried JUUL in 2016, when the device became especially ubiquitous among his high school friends.

258.    Plaintiff started using JUUL with his friends, largely because it had a cool design which made it easy to conceal, appealing flavors, and was fun to use. Part of the attraction for P.O. was the discreet slick design that would avoid detection from his parents, teachers, or other authority figures.

259.    Before P.O. tried JUUL, he was not addicted to nicotine, nor had he tried cigarettes. Since becoming addicted to JUUL, P.O. has smoked cigarettes.

260.    P.O. initially was attracted to JUUL's mango flavor, and a tried number of others, including "cool" mint and fruit. He purchased JUUL devices and pods at a convenience store in New Jersey. At the convenience store, P.O. was exposed to JUUL's point of sale advertising, promotions and messaging.

261.    Like the majority of young people surveyed, Plaintiff was not aware when he first began "JUULing" how much nicotine the device contained, or that it carried any health risks.

262.    P.O. relied to his detriment on JUUL's representations that the product was safe, not harmful, and fun.

263.     JUUL never warned P.O. that JUUL was addictive, dangerous, could cause him to suffer a cardiovascular injuries, or would permanently alter his brain.

264.     Had P.O. known that JUUL was overly addictive, carried health risks, and would cause the problems it has in his health and personal life, he never would have tried it.

265.     JUUL never disclosed that it had manipulated the nicotine in JUUL to deliver massive doses of nicotine that could addict him almost immediately, an addiction that he will now fight for the rest of his life.

266.     JUUL never instructed P.O. that the product was unsafe for him, nor how much JUUL was safe to consume.

267.     Had P.O. known that JUUL was not safe, was addictive, dangerous, could cause cardiovascular issues, could permanently alter his brain and impair his mood and mind, that JUUL had manipulated nicotine to maximize addiction, or that each JUULpod delivered substantially more nicotine than a pack of cigarettes, he would not have used or continued to use JUUL.

268.     Within a few puffs of JUUL, P.O. became addicted to nicotine. His use steadily increased, until he began using JUUL immediately upon waking, all throughout the day, and then just before going to sleep. He would JUUL during class, at home, while driving, practically anywhere that he could get away with it. He struggled to function without nicotine, and when he tried to quit using the product, he would have mood swings, and become irritable, which resulted in P.O. becoming withdrawn to the point he would avoid his family and friends. The level of nicotine his body required increased over time, and before long he was consuming on up to two Pods per day.

269.     Soon after beginning use, P.O. would go to sleep with his JUUL nearby and then immediately search for hit when he awoke each morning.

270.     There is nowhere where P.O. can go without being constantly exposed to the JUUL as it has infiltrated the entire community and state in which he lives, including even his high school.

271.     Before he started to use JUUL, P.O. was a healthy, active student. He exhibited no signs or indications that he had an addictive personality. While he has and will continue to fight his addiction and to lead as normal a life as possible, P.O.'s brain injuries have caused him to become more withdrawn, unmotivated, and impatient with his family and friends. P.O. has tried to quit but the withdraw symptoms has resulted in him using the JUUL to rid him of the symptoms.

272.     As a direct and proximate result of JUUL's conduct, P.O. suffered life-altering and permanent injuries, including: severe nicotine addiction, permanent brain changes, and mood disorders.

273.     As a result of his injuries caused by JUUL, P.O. has incurred and will incur significant medical and other expenses to sustain and/or fight his nicotine addiction for the rest of his life, pain and suffering, and emotional distress.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Strict Products Liability - Design Defect

274.     Plaintiff incorporates the above and below allegations by reference.

275.     At all relevant times, JUUL Labs, in concert and aided by Fictitious Defendants 1-13, designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled and/or sold the JUUL Devices and Pods ("JUUL Products") that Plaintiff consumed and which were intended by Defendants to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.

276.     JUUL Products were defective in design in that they did not perform as safely as an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way.

277.     Defendants had constructive notice or knowledge and knew, or in the exercise of reasonable care should have known, that its JUUL Products under ordinary use were

harmful or injurious, particularly to youths and adolescents, including the Plaintiff. Defendants knew or, should have known the risks inherent in minors ingesting nicotine, particularly severe lifelong nicotine addiction and decreased brain development. These are serious injuries in that they affect not only the short-term quality, but the remainder of the young person's life.

278.     The JUUL Defendants claim they designed JUUL for use by adult smokers. However, Defendants designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product. Defendants defectively designed JUUL in a number of ways.

279.     JUUL products are inherently defective because they contain and deliver significantly more nicotine than JUUL represents and significantly more nicotine than traditional cigarettes. Moreover, JUUL is unreasonably dangerous and therefore defective in design because it is made to create and sustain addiction. JUUL designed the product to contain more nicotine than necessary to satisfy a cigarette smoker's nicotine craving with the intention of creating addiction. JUUL's nicotine salts enhance the risk and severity of addiction; it supplies nicotine at high levels without any of the intake harshness associated with other nicotine products. Furthermore, JUUL is defectively designed in that it uses flavors that appeal to minors and enhances minors' ability to intake dangerous amounts of nicotine. The risks inherent in the design of JUUL outweigh significantly any benefits of such design.

280.     In addition, JUUL products are inherently defective in that it is created to be easy to hide, a design that is enticing to minors. Lifelong smokers are accustomed to the open, notorious and inconvenient act of smoking cigarettes – the smell and taste of cigarettes as well as the need to step outside and smoke. These are traditional properties of smoking a cigarette that smokers actually often appreciate and enjoy. A smoke break has been valued for year by smokers. A device that is easy to hide, tastes good, and does not smell is not necessary to draw in lifelong smokers as customers, but it is entirely necessary to draw in first time smokers and minors. The physical appearance of JUUL makes it easy for minors to hide it at school or at home by concealing it in their clothing, backpacks, markers, or even their hand, or by passing it

off as a USB or another device, a feature that would not be necessary or appealing to a lifelong smoker. However, the design is most certainly convenient to a minor. It also is designed in such a way as to look completely harmless. Resembling a USB drive that tastes good in this technology driven age, the JUUL device is duly attractive to nonsmokers of every age.

281.     The benefits of JUUL products' design are not outweighed by their risks, considering the gravity of the potential harm resulting from the use of the products, the likelihood that harm would occur, the feasibility and cost of an alternative safer design at the time of manufacture, and the disadvantages of an alternative design.

282.     At all times relevant, Defendants could have employed reasonably feasible alternative designs to prevent the harms discussed in the complaint. Defendants could have created the product to not specifically appeal to minors and could have created the product to appeal more to current adult smokers. Defendants also could have significantly lowered the nicotine content while still satisfying an adult smoker's nicotine cravings, maintaining the same need JUUL products so claim to meet. Defendants could have designed this product to not contain flavors that appeal to minors and make it easier to intake dangerous levels of nicotine.

283.     At all times relevant, Plaintiff was unaware of the design defects described in the Complaint. Further, Defendants knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

284.     As a result of JUUL's conduct, in violation of N.J.S.A. 2A:58C et seq., Plaintiff was harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette as described herein. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; severe nicotine addiction, a permanent injury that P.O. will now struggle with for the rest of his life; P.O.'s exposure to such a high content of nicotine has also affected his brain development at such a crucial age, an injury that cannot be undone; and economic harm in that he would not have purchased JUUL or would have paid less for it if he

had known the true facts and that he has paid a premium as a result of Defendants' defective products.

WHEREFORE, plaintiff, P.O., demands Judgment for damages generally against the defendants, JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND FICTITIOUS DEFENDANTS 1-13, individually, jointly, severally, or in the alternative, together with interest and costs of suit.

## SECOND CAUSE OF ACTION
### Strict Products Liability - Failure to Warn

285.    Plaintiff incorporates the above and below allegations by reference.

286.    At all times relevant, Defendants, in concert, and aided by Fictitious Defendants 1-13, manufactured, marketed, distributed, and/or sold the JUUL Products that Plaintiff consumed.

287.    At all times relevant, Defendants were well-aware that JUUL is a dangerous product that contains highly addictive levels of nicotine and subjects users to severe nicotine addiction and other serious medical conditions, as described in this Complaint. Further, the JUUL products that plaintiff consumed had other potential risks that were known or were knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community well before and at the time of manufacture, market, distribution, and sale. Despite having that knowledge, Defendants failed to adequately warn the minor Plaintiff of the dangerous, addictive nature of JUUL as well as the multitude of health risks it posed.

288.    The potential risks presented a substantial danger when the JUUL Products were used or misused in an intended or reasonably foreseeable way.

289.    At all times relevant, Plaintiff would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant JUUL has intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction. Since the Altria Defendants partnered with JUUL, they too have since intentionally

downplayed, misrepresented, concealed and failed to warn of the heightened risks of nicotine exposure and addiction.

290.     Further, the ordinary consumer of JUUL Products would not have recognized the potential for risks for the same reasons.

291.     JUUL Products were defective and unreasonably dangerous when they left Defendants' possession because they did not contain adequate warnings, including warnings that the products are not safe for anyone under 26 years old, may cause strokes, heart attacks and other cardiovascular injuries, are powerfully addictive, may cause permanent brain changes and mood disorders, may impair learning and cognition. Additionally, the products lacked sufficient instructions, including that the product should not be used concurrently with cigarettes, and instructions regarding how many pods are safe to consume in a day.

292.     Instead, as described herein, Defendants marketed their products to young people and made them available in youth-friendly colors and flavors. Defendants also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability, incorporating appealing flavors, and increasing the level of nicotine that is absorbed by users, making them even more addictive and dangerous.

293.     Defendants had constructive notice or knowledge and knew, or in the exercise of reasonable care should have known, that its Products were dangerous, had risks, and were defective without adequate warnings or instructions, including because delivering high doses of nicotine to a young person could cause severe addiction to nicotine, permanently alter the structure of the developing brain and resulting in irreversible, life-altering injuries.

294.     In all forms of advertising as well as social media communications, Defendants failed to adequately warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendants failed to adequately warn in their advertising, social media communications, or anywhere on the product label that the product was not for sale for minors and should not be

used or consumed by them. Instead, as described herein, Defendants marketed their products to minors and made them available in youth-friendly colors and flavors. Defendants also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability and increased the level of nicotine that is absorbed by users, making them even more addictive.

295.     Specialized retailers of tobacco products, as well as convenience stores which market and display visuals promoting JUUL, are well-acquainted with the dangers of nicotine. Defendants had an opportunity to warn Plaintiff directly at these locatons that JUUL products created a high level of risk of harms caused by unreasonable amounts of nicotine exposure and failed to do so. Instead, these Defendants marketed and sold JUUL products without adequately warning consumers, poisoning Plaintiff's brain for profit.

296.     The defects in JUUL Products, including the lack of warnings, existed at the time the JUUL pods and devices were sold and/or when the JUUL pods and devices left JUUL's possession or control.

297.     As a result of Defendants' failures to adequately warn and/or instruct, in violation of N.J.S.A. 2A:58C et seq., Plaintiff was harmed directly and proximately as described herein. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; severe nicotine addiction, a permanent injury that P.O. will now struggle with for the rest of his life; P.O.'s exposure to such a high content of nicotine has also affected his brain development at such a crucial age, an injury that cannot be undone; and economic harm in that he would not have purchased JUUL or would have paid less for it if he has known the true facts and that he had paid a premium as a result of Defendants' failure to warn.

WHEREFORE, plaintiff, P.O., demands Judgment for damages generally against the defendants, JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND FICTITIOUS DEFENDANTS 1-13, individually, jointly, severally, or in the

alternative, together with interest and costs of suit.

## THIRD CAUSE OF ACTION
### Negligence and Gross Negligence

298.     Plaintiff incorporates the above and below allegations by reference.

299.     Defendants had a duty and owed a duty to Plaintiff to exercise a degree of reasonable care including, but not limited to: ensuring that JUUL marketing does not target minor; ensuring that JUUL devices and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors; designing a product that is not defective and unreasonably dangerous; designing a product that will not addict youth or other users to nicotine; adequately warning of any reasonably foreseeable adverse events with respect to using the product. Defendants designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those consumed it, such as Plaintiff.

300.     JUUL's Products were the types of products that could endanger others if negligently made, promoted, or distributed. Defendants knew the risks that young people would be attracted to their electronic cigarette devices and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to anyone under age 26, but especially to minors.

301.     Defendants knew or should have known that their marketing, distribution, and sales practices did not adequately safeguard Plaintiff from the sale and/or distribution of electronic cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

302.     Defendants were negligent in designing, manufacturing, supplying, distributing, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, and/or labeling JUUL's Products.

303.     As a powerfully addictive and dangerous nicotine-delivery device, Defendants knew or should have known that JUUL Products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied and distributed properly, without defects and with due care to avoid needlessly causing harm. Defendants knew or should have known that its JUUL Products could cause serious risk of harm, particularly to young persons like Plaintiff.

304.     Specifically, Defendants are well-acquainted with the legal age for purchase as well as the dangers of nicotine. Defendants owed a particular duty to Plaintiff to not sell nicotine-containing products to minors, to warn of the product's dangers, and to promote, advertise or display the product in a way so that the ultimate consumer is not misled. Defendant breached that duty by failing to disclose to the ultimate consumer that the JUUL products purchased were highly addictive in nature, carried serious health risks, were not for use by minors, and by actively promoting and advertising JUUL products so as to minimize their risks.

305.     Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

306.     The negligence and extreme carelessness of Defendants includes, but is not limited to, the following:

a.     Failure to perform adequate testing of the JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

b.     Failure to take reasonable care in the design of JUUL's Products;

c.     Failure to use reasonable care in the production of JUUL's Products;

d.     Failure to use reasonable care in the manufacture of JUUL's Products;

e.     Failure to use reasonable care in the assembly of JUUL's Products;

f.     Failure to use reasonable care in supplying JUUL's Products;

g.     Failure to use reasonable care in distributing JUUL's Products;

h.      Failure to use reasonable care in advertising, promoting, and marketing JUUL's Products;

i.      Promotion of JUUL to young people under age 26, and especially to minors;

j.      Use of flavors and design to appeal to young people under age 26, and especially to minors, in that the products smell good, look cool and are easy to conceal from parents and teachers;

k.      Use of design that maximizes nicotine delivery while minimizing "harshness", thereby easily creating and sustaining addiction;

l.      Failure to prevent JUUL from being sold to young people under age 26, particularly to minors;

m.      Failure to prevent JUUL use among young people under age 26, particularly for minors;

n.      Failure to curb JUUL use among young people under age 26, particularly for minors;

o.      Failure to develop tools or support to help people addicted to JUUL cease using the product, including manufacturing lesser amounts of nicotine;

p.      Failure to reasonably and properly test and properly analyze the testing of JUUL's Products under reasonably foreseeable circumstances;

q.      Failure to warn its customers about the dangers associated with use of JUUL's Products, in that it was unsafe for anyone under age 26, significantly increases blood pressure, carries risks of stroke, heart attacks, and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition.

r.      Failure to instruct customers not to use the product if they were under 26, particularly minors, and failing to provide any instructions regarding a safe amount of JUUL pods to consume in a day.

s.      Failure to ensure that JUUL's Products would not be used by persons like Plaintiff who were not smokers and who were under age 26, particularly minors;

t.      Failure to warn customers that JUUL had not adequately tested or researched JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

u.      Failure to utilize proper materials and components in the design of JUUL's Products to ensure they would not deliver unsafe doses of nicotine;

v.      Failure to use due care under the circumstances;

w.      Failure to take necessary steps to modify JUUL's Products to avoid delivering high doses of nicotine to young people and repeatedly exposing them to toxic chemicals;

x.      Failure to recall JUUL's Products; and

y.      Failure to inspect JUUL's Products for them to operate properly and avoid delivering unsafe levels of nicotine to young persons.

307.      Defendants breached the duties they owed to Plaintiff and in doing so, were wholly unreasonable. A responsible company, whose primary purpose is to help adult smoker, would not design a product to appeal to minors and nonsmokers nor market their products to minors and nonsmokers. If they are aware of the dangers of smoking and nicotine ingestion enough to create a device to help people stop smoking, then they are aware of the dangers enough to know that it would be harmful for young people and nonsmokers to use.

308.      But for Defendants' duties and breaches thereof, Plaintiff would not have been harmed as alleged in the Complaint.

309.      Plaintiff was harmed directly and proximately by Defendants' negligence. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; severe nicotine addiction, a permanent injury that P.O. will now struggle with for the rest of his life; P.O.'s exposure to such a high content of nicotine has also affected his brain development at such a crucial age, an injury that cannot be undone; and economic harm in that he would not have purchased JUUL, would have paid less for it if he had known the true

facts, or would have been unable to purchase the JUUL products altogether and that he has paid a premium because of Defendants' negligence.

WHEREFORE, plaintiff, P.O., demands Judgment for damages generally against the defendants, JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND FICTITIOUS DEFENDANTS 1-13, individually, jointly, severally, or in the alternative, together with interest and costs of suit.

### FOURTH CAUSE OF ACTION
#### Negligence – Wanton and Willful Conduct

310.    Plaintiff incorporates by reference paragraphs above as if fully set forth herein.

311.    Defendants had a duty and owed a duty to Plaintiffs to exercise a degree of reasonable certainty including, but not limited to: ensuring that JUUL marketing does not target minors, and ensuring that JUUL devices and JUULpods are not sold and/or distributed to minors. The duty to minors involves "[t]he caution and care required of others toward the infant are measured by the age, maturity, the capacity, and the intelligence of the child."[103] The totality of the Plaintiff's age, maturity level, capacity and intelligence heighten the duty Defendants owed to Plaintiff.

312.    Defendants knew the risks that minors would be attracted to their electronic cigarette devices and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors and young people.

313.    Defendants could have easily marketed the products to a whole different audience of prior smokers as well as could have easily informed the ultimate consumers of the extremely high nicotine content. Defendants could have refused to sell to convenience stores and tobacco retail stores which it knew would sell JUUL products to minors. Regardless of age,

---

[103] *See* Howell v. Roueche, 81 So.2d 297, 301 (Ala. 1955).

Defendants could have easily warned of the high nicotine content to young persons and prior nonsmokers looking to purchase the product under the belief that the product is harmless.

314.     Defendants breached the duties they owed to Plaintiff and in doing so, were wholly unreasonable. Defendants breached their heightened duties owed to minors when they intentionally marketed and sold JUUL products to minors, which they should not have done.

315.     Defendants' acts and omissions constitute wanton and willful conduct, because they constitute a total lack of care and an extreme departure from what a reasonably careful person or a reasonably careful company that holds itself out as manufacturers of smoking cessation devices would do in the same situation to prevent foreseeable harm to young persons, like Plaintiff.

316.     Defendants acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff. Defendants acted with wantonness by consciously selling a nicotine product to Plaintiff P.O. with knowledge that the child was underage, of the high nicotine content of the product, and that minors should not ingest nicotine. Defendants' acts and omissions had a great probability of causing significant harm and in fact resulted in such harm.

317.     But for Defendants' duties and breaches thereof, Plaintiff would not have been harmed as alleged in this Complaint.

318.     Plaintiff was harmed directly and proximately by Defendants' negligence and willful and wanton conduct. Such harm include significant exposure to toxic substances, which may cause or contribute to causing disease; severe nicotine addiction, a permanent injury that P.O. will now struggle with for the rest of his life; P.O.'s exposure to such a high content of nicotine has also affected his brain development as such a crucial age, an injury that cannot be undone; and economic harm in that he would not have been able to purchase JUUL if Defendant had properly utilized the state's age safeguard to protect minors. Nor would P.O. have purchased JUUL products had he known of the dangers. P.O. has paid and will continue to pay a premium because of Defendants' negligence.

319.     In order to deter the defendants, and others similarly situated, from recklessly and consciously selling a nicotine product to Plaintiff P.O. with knowledge that the child was underage, of the high nicotine content of the product, and that minors should not ingest nicotine. Defendants' acts and omissions had a great probability of causing significant harm and in fact resulted in such harm, and therefore, the imposition of a substantial penalty, in the form of Punitive Damages, is both necessary and appropriate.

WHEREFORE, Plaintiff, P.O., hereby demands Judgement against the Defendant, JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND FICTITIOUS DEFENDANTS 1-13, individually, jointly, severally, for Punitive Damages in the amount to be determined by the Court, together with interest, costs of suit, and such other relief as the Court may deem just.

## FIFTH CAUSE OF ACTION
### <u>Fraud</u>

320.     Plaintiff incorporates by reference paragraphs above as if fully set forth herein

321.     At all times relevant, Defendants fraudulently and deceptively sold or partnered to sell products to Plaintiff as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendants knew it to be untrue.

322.     Defendants had a duty to disclose material facts about JUUL to Plaintiff, as:

a.     Defendants disclosed some facts to Plaintiff about the nature and safety of its products but intentionally failed to disclose other facts, making the disclosures it did make misleading or deceptive; and

b.     Defendants intentionally failed to disclose certain facts about the nature and safety of JUUL products that were known only to Defendants and that Defendants knew Plaintiff could not have known or reasonably discovered.

323.    At all times relevant, Defendants fraudulently and deceptively sold or partnered to sell JUUL products to Plaintiff as safe or not harmful, when Defendants knew it to be untrue.

324.    Defendants fraudulently and deceptively downplayed or minimized any risk associated with e-cigarettes generally and JUUL in particular for young persons under age 26, especially minors. At all relevant times, Defendant JUUL represented its products on its website as a "smarter" choice. Defendant JUUL pitched investors by claiming that the product was not harmful, and therefore any concern about addiction was irrelevant. Defendants and/or others worked together to pitch news stories or other media content designed to downplay the risks of e-cigarettes, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers buying JUUL products, and to avoid regulation or legislative efforts to control sales.

325.    Defendants fraudulently and deceptively failed to disclose to Plaintiff that the JUUL creates an insatiable nicotine addiction, significantly increases blood pressure, can cause mood disorders, induce seizures and other adverse health effects.

326.    Defendants fraudulently and deceptively failed to disclose that they had not adequately researched or tested JUUL to assess its safety before placing it on the market and promoting it to young people under age 26.

327.    Defendants also fraudulently and deceptively failed to disclose to Plaintiff that the JUUL nicotine salts purchased were highly addictive in nature, making it extremely difficult for one to cease purchasing JUULpod refills.

328.    Defendants further failed to disclose to Plaintiff that JUUL is designed to create and sustain an addiction to nicotine. Defendants also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendants did so without notifying Plaintiff. Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes.

329.    Defendants fraudulently misrepresented to users the amount of nicotine consumed by using JUUL. As previously explained, Defendant JUUL claims that one JUULPod is "approximately equivalent to about 1 pack of cigarettes," but that is false and misleading. The amount of nicotine consumed from one JUULPod is actually equivalent to the amount of nicotine consumed through at least two packs of traditional cigarettes.

330.    Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase or consume a JUUL E-cigarette and/or JUULpods.

331.    Plaintiff did not know of the facts that Defendants concealed.

332.    Defendants intended to deceive Plaintiff and the public by concealing these facts.

333.    Defendants had a duty to accurately provide this information to Plaintiff.  In not so informing Plaintiff, Defendants breached their duty.  Defendants also gained financially from, and as a result of their breach.

334.    Defendants had ample opportunities to disclose these facts to Plaintiff, through packaging, advertising, retail outlets, particularly convenience stores and tobacco retailers, and on social media. Defendants concealed material information at all relevant times to this Complaint. Defendants have yet to disclose the truth about JUUL products.

335.    Plaintiff relied to his detriment on Defendants' fraudulent omissions. Had Plaintiff been adequately informed of the material facts by in store tobacco retailers and convenience stores, which was concealed from him regarding the safety of JUUL, and not been intentionally deceived by Defendants, he would not have purchased or used JUUL products.

336.    Plaintiff was harmed directly and proximately by Defendants' fraud. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; severe nicotine addiction, a permanent injury that P.O. will now struggle with for the rest of his life; P.O.'s exposure to such a high content of nicotine has also affected his

brain development at such a crucial age, an injury that cannot be undone; and economic harm in that he would not have purchased JUUL or would have paid less for it if he had known the true facts and that he had paid a high premium as a result of Defendants' fraud.

337.    Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendants. Defendants' conduct was designed to maximize Defendants' profits even though Defendant knew that it would cause loss and harm to Plaintiff.

338.    In order to deter the defendants, and others similarly situated, from recklessly and consciously selling a nicotine product to Plaintiff P.O. with knowledge that the child was underage, of the high nicotine content of the product, and that minors should not ingest nicotine. Defendants' acts and omissions had a great probability of causing significant harm and in fact resulted in such harm, and therefore, the imposition of a substantial penalty, in the form of Punitive Damages, is both necessary and appropriate.

WHEREFORE, Plaintiff, P.O., hereby demands Judgement against the Defendant, JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND FICTITIOUS DEFENDANTS 1-13, individually, jointly, severally, for Punitive Damages in the amount to be determined by the Court, together with interest, costs of suit, and such other relief as the Court may deem just.

## SIXTH CAUSE OF ACTION
### Conspiracy to Commit Fraud

339.    Plaintiff incorporates by reference paragraphs above as if fully set forth herein

340.    During all relevant times, including before Plaintiff consumed JUUL, Defendant JUUL was part of a conspiracy with tobacco and e-cigarette industry players, Altria Group, PAX Labs, Inc. and Fictitious Defendants 1-13, to fraudulently conceal, misrepresent, and downplay the risks of e-cigarettes to boost profits at the expense of public health.

Defendants, for research and development, marketing, and distribution purposes, engaged consultants, pundits, academics, lobbyists, media personalities, reporters, researchers and other influencers to tout the safety of e-cigarettes, and benefits of nicotine, while minimizing or downplaying the dangers, particularly to those under age 26, playing on the vulnerabilities of young people.  These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers buying JUUL products, and to avoid regulation or legislative efforts to control sales.

341.     JUUL was aware that others in the e-cigarette and tobacco industry, Defendant Altria Group, PAX and Fictitious Defendants 1-13 planned to engage in a campaign of doubt to mislead, downplay, and deflect concerns about the risks of e-cigarettes and nicotine, and to fraudulently conceal material information about the safety of these products and compounds.

342.     JUUL agreed with others in the e-cigarette and tobacco industry, Defendants Altria Group, PAX and Fictitious Defendants 1-13 and intended that the conspiracy to commit fraudulent concealment be committed.

343.     Defendants well-understood and continues to understand that by working in concert with other e-cigarette manufacturers and the tobacco industry, it can more effectively mislead and fraudulently conceal material facts from the public, including Plaintiff, regarding risks of its products, as described herein.

344.     Defendants' participation in this conspiracy was a substantial factor in causing Plaintiff's harm as alleged herein.

345.     Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendants.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

WHEREFORE, Plaintiff, P.O., hereby demands Judgement against the Defendant, JUUL

LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND

FICTITIOUS DEFENDANTS 1-13, individually, jointly, severally, for Punitive Damages in the

amount to be determined by the Court, together with interest, costs of suit, and such other relief

as the Court may deem just.

## SEVENTH CAUSE OF ACTION
### Intentional Misrepresentation

346.     Plaintiff incorporates by reference paragraphs above as if fully set forth
herein

347.     At all times relevant, Defendants represented to Plaintiff via the media,
advertising, website, social media, packaging, and promotions that:

a.      JUUL products were safe or not harmful; and

b.      That one JUULPod is "approximately equivalent to about 1 pack of cigarettes"

348.     These representations were false.  JUUL is unsafe for anyone under age 26,
especially minors.  The amount of nicotine consumed from one JUULPod is actually equivalent
to the amount of nicotine consumed through at least two packs of traditional cigarettes.

349.     Defendants knew these representations were false, or made them recklessly
without regard for their truth.  For example, JUUL claims that it did not study the safety of its
products, acknowledging that it had a vested interest, and instead left it to others to analyze their
risks.

350.     Defendants intended for Plaintiff to rely on these representations.

351.     Each of these misrepresentations were material at the time they were made.
In particular, each of the misrepresentations concerned material facts that were essential to the
analysis undertaken by Plaintiff as to whether to purchase or consume JUUL ENDS or Pods.

352.     Defendants have yet to disclose correct these misrepresentations about JUUL
products.

353.    Plaintiff reasonably relied on these representations and was harmed as described herein. Plaintiff's reliance on Defendants' representation was a substantial factor in causing his harms, including becoming powerfully addicted to JUUL. Had Defendants told Plaintiff the truth about the safety and composition of JUUL's products, he would not have purchased them.

354.    Defendants' intentional misrepresentation was a substantial factor in Plaintiff's harm as described herein, including that he became severely addicted to the nicotine and incurred permanent brain changes, resulting in irreversible, life-altering injuries. He also suffered economic harm in that he would not have purchased JUUL or would have paid less for it if he had known the true facts and that he has paid a high premium as a result of Defendants' fraud.

355.    Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

WHEREFORE, Plaintiff, P.O., hereby demands Judgement against the Defendant, JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND FICTITIOUS DEFENDANTS 1-13, individually, jointly, severally, for Punitive Damages in the amount to be determined by the Court, together with interest, costs of suit, and such other relief as the Court may deem just.

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**

356.    Plaintiff incorporates by reference paragraphs above as if fully set forth herein.

357.    As described in this Complaint, Defendants knowingly sold or partnered to sell JUUL products to Plaintiff in a manner that was unfair, unreasonable, unconscionable, and oppressive.

358.    As a result of Defendants' intentional, unlawful, and deceptive actions described above, Defendants were enriched at the expense of Plaintiff.

359.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits received from Plaintiff. Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiff for the monies paid to Defendants for its defective JUUL products.

WHEREFORE, plaintiff, P.O., demands Judgment for damages generally against the defendants, JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., PHILIP MORRIS USA, INC., AND FICTITIOUS DEFENDANTS 1-13, individually, jointly, severally, or in the alternative, together with interest and costs of suit.

STARK & STARK
A Professional Corporation
Attorneys for Plaintiffs

By: _____
DOMENIC B. SANGINITI, JR.

Dated: August 13, 2019

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury as to all issues.

STARK & STARK
A Professional Corporation
Attorneys for Plaintiffs

By: _____
DOMENIC B. SANGINITI, JR.

Dated:   August 12, 2019